**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SANFORD AIRPORT AUTHORITY,**

        **Plaintiff/Counterclaim Defendant,**     **CASE NO.: 6:23-cv-1563-PGB-DCI**

**v.**

**GREATER ORLANDO AVIATION**
**AUTHORITY,**

        **Defendant/Counterclaim Plaintiff.**
_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................ 2

II.   FACTUAL AND PROCEDURAL BACKGROUND ................................. 4

   A.   Sanford and Its Trademark Applications ............................................. 4

   B.   GOAA and Its Airport, "MCO" ........................................................... 5

   C.   The Parties Discuss The New Name in the 1990s ............................... 6

   D.   Allegiant Temporarily Uses MCO ....................................................... 8

   E.   GOAA Opposes SAA's Trademark Filings, but Still Does Not Assert Trademark Infringement ..................................................................... 9

III.   LEGAL STANDARD ............................................................................... 9

   A.   Summary Judgment ............................................................................. 9

   B.   Laches .................................................................................................. 9

   C.   Acquiescence ..................................................................................... 10

   D.   Common Law Trademark Infringement and Unfair Competition .......... 11

IV.   ARGUMENT .......................................................................................... 12

   A.   SAA is Entitled to Summary Judgment on Its Laches Defense ................ 12

      1.   GOAA Delayed in Asserting Its Trademark Rights ................................ 12

      2.   GOAA's Decades Long Delay Is Not Excusable ..................................... 14

      3.   SAA Has Suffered and Will Continue to Suffer Undue Prejudice If GOAA's Claims Are Allowed ................................................................. 18

   B.   GOAA Acquiesced to SAA's Airport Name ................................................ 20

      1.   GOAA's Acquiescence for Over Two Decades Was a Representation that GOAA Would Not Assert a Claim ............................................... 20

      2.   GOAA's Delay Is Inexcusable .............................................................. 22

      3.   GOAA's Delay Caused Plaintiff Undue Prejudice ................................... 22

   C.   SAA is Entitled to Summary Judgment on Defendant's Counterclaim for Likelihood of Confusion Because the Most Important Factor – Actual Confusion –Weighs Heavily in Plaintiff's Favor Where the Marks Have Co-Existed for Nearly Thirty with *De Minimis* Actual Confusion, If Any .............. 22

V.   CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmBrit, Inc. v. Kraft, Inc.,*
812 F.2d 1531 (11th Cir. 1986) ................................................................................. 16

*Amstar Corp. v. Domino's Pizza, Inc.,*
615 F.2d 252 (5th Cir. 1980) ................................................................................... 29

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.,*
522 F.3d 1200 (11th Cir. 2008) ............................................................................... 16

*Aronowitz v. Health-Chem Corp.,*
513 F.3d 1229 (11th Cir. 2008) ............................................................................... 14

*Buccellati Holding Italia SPA v. Laura Buccellati, LLC,*
5 F. Supp. 3d 1368 (S.D. Fla. 2014) ....................................................................... 19

*Coach House Rest., Inc. v. Coach & Six Rests., Inc.,*
934 F.2d 1551, 19 USPQ2d 1401 (11th Cir. 1991) ............................................. 4, 26

*DORPAN, SL v. Hotel Melia, Inc.,*
728 F.3d 55 (1st Cir. 2013) ..................................................................................... 30

*Dropbox, Inc. v. Thru Inc.,*
2016 WL 6696042 (N.D. Cal. Nov. 15, 2016) ................................................... *passim*

*Edge Systems LLC v. Aguila,*
186 F.Supp.3d 1330 (S.D. Fla. 2016) ...................................................................... 14

*Frehling Enterprises, Inc. v. Int'l Select Group, Inc.,*
192 F.3d 1330 (11th Cir. 1999) ............................................................................... 14

*Future Proof Brands, LLC v. Molson Coors Bev. Co.,*
982 F.3d 280 (5th Cir. 2020) ................................................................................... 30

*IP-6 Int'l, Inc. v. Nutrigold, Inc.,*
2023 WL 9958386 (M.D. Fla. Mar. 31, 2023) ......................................................... 23

*Kars 4 Kids Inc. v. Am. Can!,*
8 F.4th 209 (3d Cir. 2021) ....................................................................................... 23

*Kason Indus., Inc. v. Comp. Hardware Grp., Inc.,*
120 F.3d 1199 (11th Cir. 1997) ............................................................... 13, 15, 16, 19

*Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC,*
    7 F.4th 989 (11th Cir. 2021)................................................................ 12, 22, 23

*Sun Banks v. Sun Fed. Sav. & Loan,*
    651 F.2d 311 (5th Cir. 1981).......................................................................... 29

*Syndicate Sales, Inc. v. Hampshire Paper Corp.,*
    192 F.3d 633 (7th Cir. 1999).......................................................................... 29

*T.G.I Friday's, Inc. v. Int'l Rest. Grp., Inc.,*
    405 F. Supp. 698 (M.D. La. 1975)................................................................. 31

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.,*
    889 F.2d 1018 (11th Cir. 1989)...................................................................... 15

*Tana v. Dantanna's,*
    611 F.3d 767 (11th Cir. 2010)................................................................... 14, 29

*Therma-Scan, Inc. v. Thermoscan, Inc.,*
    295 F.3d 623 (6th Cir. 2002).......................................................................... 30

*Uber Promotions, Inc. v. Uber Tech., Inc.,*
    162 F. Supp. 3d 1253 (N.D. Fla. 2016).......................................................... 30

*Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.,*
    683 F.3d 1266 (11th Cir. 2012)................................................... 13, 14, 26, 28

*Univ. of Pittsburgh v. Champion Products Inc.,*
    686 F.2d 1040 (3d Cir. 1982)................................................................... 21, 22

**Statutes**

15 U.S.C. §1125(a)(1)(A).................................................................................. 14

1206, Lanham Act...................................................................................... 12, 15

 § 95.11(7), Fla. Stat. ....................................................................................... 16

§ 164, Fla. Stat................................................................................................. 20

**Other Authorities**

6 *McCarthy on Trademarks and Unfair Competition* § 31:12 (5th ed. 2021 ................. 23

6 *McCarthy on Trademarks and Unfair Competition* § 31:14 (5th ed. 2021 ................. 19

Trademark Trial and Appeal Board Manual of Procedure § 102.01 ...................... 18

Sanford Airport Authority ("SAA" or "SFB") rebranded its airport as the Orlando Sanford Airport in 1995. In 1996, SAA rebranded its airport as the Orlando Sanford International Airport and has operated under that name ever since. Defendant has known about this name since the very beginning in 1995 and took no action to stop SAA from using it. Rather, the two airports discussed at length Defendant's concerns in the late 1990s, culminating in Defendant taking no action against SAA. Instead, SAA continued to grow under its new brand, and now almost 30 years later, both Orlando Sanford International Airport and Orlando International Airport have flourished under their respective names.

Recently, the Melbourne airport wanted to call itself the Orlando Melbourne International Airport. Melbourne also launched a website on the domain: "theorlandoairport.com." Defendant objected and was concerned that Melbourne would defend itself by arguing that SAA had peacefully coexisted with Defendant for 20+ years at that time. Defendant lodged an objection to SAA's trademark filings so that Defendant could argue to Melbourne it had taken some action against SAA. Defendant and Melbourne have since settled their dispute, but that left the trademark opposition proceeding against SAA.

The USPTO resolved that proceeding without properly taking into account the peaceful coexistence of the 2 airports over the past decades. SAA appealed that decision by filing this lawsuit. In response to that appeal, Defendant filed a counterclaim for supposed trademark infringement and unfair competition, notwithstanding Defendant's acquiescence to SAA's brand since 1995. SAA is entitled to summary judgment that Defendant is estopped from pursuing any

infringement or unfair competition claim against SAA and has instead acquiesced to the Orlando Sanford International Airport brand.

## I.    __INTRODUCTION__

Thirty years ago, in 1995, the Greater Orlando Aviation Authority ("GOAA") first raised concern with SAA's then-proposed mark ORLANDO SANFORD INTERNATIONAL AIRPORT for airport services. GOAA reached out to SAA in 1995 and expressed its concern.  GOAA asked its lawyers what it should do.  Those lawyers told GOAA that it should conduct a survey to see if there would be a likelihood of consumer confusion based on the different brands, and if so, GOAA should then pursue litigation against SAA.  GOAA did not undertake any survey.  GOAA's and SAA's Boards had numerous discussions about the name. GOAA did not file any lawsuits against SAA.  Instead, the parties agreed to create a liaison to see if any of GOAA's concerns needed to be addressed.  SAA never heard from GOAA any further, and continued to operate under its Orlando Sanford International Airport name.  In the 30 years since, both GOAA's airport and SAA's airport have flourished under their respective names ORLANDO INTERNATIONAL AIRPORT and ORLANDO SANFORD INTERNATIONAL AIRPORT.

SAA relied on GOAA's inaction and acquiesce into its airport's name and grew its airport from a 48,186 passenger/year airport in 1995 to a 2,877,526 passenger/year airport in 2024.  GOAA's MCO similarly grew, servicing 22 million passengers in 1995 and 57 million in 2024.  Not only did GOAA acquiesce to SAA's name, the market clearly demonstrated that both airports could

peacefully exist under their respective branding as airport customers are accustomed to searching for geographic identifiers associated with airports.

After developing substantial goodwill in the ORLANDO SANFORD INTERNATIONAL AIRPORT brand and its common law rights since 1996 – and in reliance on GOAA's silent acquiescence since 1995 – SAA pursued federal registrations in 2016. Federal trademark registration is not required to use a trademark, but enhances the rights a trademark holder enjoys. SAA filed applications[1] to register the ORLANDO SANFORD INTERNATIONAL AIRPORT word mark and associated design mark depicted below:



The USPTO, fully aware of GOAA's airport and its trademark rights, approved SAA's trademark applications. In 2017, more than 20 years after GOAA gave up on objecting to SAA's name, GOAA filed oppositions with the USPTO arguing that it would be hurt by these registrations.[2] While not dispositive here, it is believed that GOAA lodged this opposition not because it was concerned with SAA's airport name, but rather because it was engaged in litigation with Melbourne and wanted to head off any arguments Melbourne would make about

---

[1] Sanford also filed for registration of its mark WE ARE SFB: SIMPLER. FASTER. BETTER. The mark registered on April 4, 2017, under Registration No. 5,175,377. Dkt. 1-6.

[2] The Trademark Trial and Appeal Board ("TTAB") decision sustaining Defendant's opposition did not address Plaintiff's defenses of acquiescence as to registration. *See* Dkt. 1-9 at 59-61; *see also Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 19 USPQ2d 1401, 1404 (11th Cir. 1991) ("[A]cquiescence as to use" is distinct from "acquiescence as to registration."). Defendant's acquiescence to SAA's use of its ORLANDO SANFORD INTERNATIONAL AIRPORT brand is the basis of this summary judgment motion.

other airports using the geographic descriptor "Orlando" in their names. While outside the scope of this motion, it is notable that GOAA and SAA's airports are both in the Orlando-Kissimmee-Sanford metropolitan statistical area, while Melbourne is not.

GOAA has never sued SAA for trademark infringement, other than its counterclaim here. That counterclaim was not filed until October 27, 2023 (Dkt. 13), 28 years after Sanford became known as ORLANDO SANFORD INTERNATIONAL AIRPORT. In other words, GOAA slept on its asserted rights, and through that 28-year silence, SAA relied on this silence and built its reputation under this brand. It is simply too late now for GOAA to walk back its decision not to assert its rights or a claim after nearly 30 years of coexistence. It also appears clear that the airports worked out an agreement and understanding to help grow the Orlando area together. GOAA's 30-year delay in asserting its rights only seeks to undo whatever deal was made between the airports decades ago. GOAA's claims are barred and SAA is entitled to summary judgment.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Sanford and Its Trademark Applications

Plaintiff is a special entity established by the Florida legislature to operate the Orlando Sanford International Airport. SOF ¶¶1,3.[3] Plaintiff itself is not the City of Sanford, Florida, although the City of Sanford owns the airport. SOF ¶¶1,3.

---

[3] The Statement of Material Facts ("SOF") comprises the Stipulation of Undisputed Material Facts pursuant to the Court's Scheduling Order [Dkt. 32] and Statement of Disputed Facts which are filed concurrently herewith.

The Orlando Sanford International Airport is located in Sanford, Florida, twenty-five miles from downtown Orlando, Florida. SOF ¶1. This airport is in the Orlando-Kissimmee-Sanford metropolitan statistical area. SOF ¶2.  The airport has been in operation since at least 1942.  SOF ¶3.  On April 4, 1995, Plaintiff's governing body voted to change the name of the airport from Central Florida Regional Airport to Orlando Sanford Airport. SOF ¶4.  In 1996, Plaintiff changed the name of the airport to the Orlando Sanford International Airport. SOF ¶5[4]. Plaintiff's airport code is "SFB."  SOF ¶6.  Plaintiff has operated the airport under the name Orlando Sanford International Airport continuously and without any issue or controversy since at least 1996. SOF ¶7.

On July 26, 2016, Plaintiff filed trademark applications to register the words "ORLANDO SANFORD INTERNATIONAL AIRPORT" and the design mark OrlandoSanford INTERNATIONAL AIRPORT *We Are SFB: Simpler. Faster. Better.* (the "SAA design mark" and together with the SAA word mark, the "SAA Marks"). SOF ¶¶ 8-9.

### B.   GOAA and Its Airport, "MCO"

GOAA, like Sanford, is a special entity established by the Florida legislature. SOF ¶12.  GOAA is not the City of Orlando. SOF ¶13. GOAA operates the Orlando International Airport, also referred to by its airport code "MCO."  SOF ¶11.  MCO is located approximately 31 miles from Orlando Sanford International Airport. SOF ¶14.  MCO is in the Orlando-Kissimmee-Sanford metropolitan statistical area.

---

[4] Defendant seeks to dispute this fact, but its own interrogatory response states that "Sanford's adoption of the **Orlando Sanford International Airport mark** on April 4, 1995 prompted the adoption of the [GOAA Legal Opinion]."  Exhibit 8 at 4 (emphasis added).

SOF ¶15.  In 2024, MCO was the seventh busiest airport in the United States and the busiest in Florida based on passenger enplanement data from the Federal Aviation Administration.  SOF ¶16.  In the twenty-nine years since Plaintiff changed its name, MCO has serviced <u>hundreds of millions</u> of passengers. SOF ¶18.

### C.    The Parties Discuss the New Name in the 1990s

GOAA first learned about SAA's airport name change to Orlando Sanford Airport around May 1995. SOF ¶19.   GOAA believed that "action needs to be taken" and authorized having its legal counsel address the issue.  *Id*.  Around June 14, 1995, GOAA received an opinion letter from its attorneys concerning SAA's airport's name ("GOAA's Opinion Letter").  SOF ¶20.  GOAA's Opinion Letter addressed the issue of a possible likelihood of confusion between the airport names.  SOF ¶20.  GOAA's counsel recommended GOAA share its concerns with SAA, and if the parties could not find an agreeable resolution, then GOAA should survey the relevant consumers to determine if indeed there was a likelihood of confusion:

> 2.    If the efforts [to convince SAA to change its name] do not succeed, that GOAA initiate a strategy to survey Packagers and Travelers who have utilized the Sanford airport to determine the extent of confusion which attended their decisions to travel over the Sanford airport.  There are accepted techniques for conducting surveys of this kind.

> 3.    If the survey results show no significant level of confusion among Packagers and Travelers, it would be reasonable for GOAA to defer further action at that time.

SOF ¶20.  The advice went on to explain that should the survey show a significant level of confusion, GOAA should consider whether to file suit.  SOF ¶20.

6

GOAA claims that it did not undertake a trademark confusion survey at any time in 1995. SOF ¶ 25.  But, notably, at the Board meeting a week after GOAA received GOAA's Opinion Letter, the 2nd item on the agenda was a presentation "Discussion of Action Plans Responding to Customer Survey."  SOF ¶21.  At this same meeting, GOAA's Executive Director (Mr. Bullock) explained:

> [the Executive Director] had an opportunity to review the analysis prepared by Mr. van den Berg.  He mentioned several important factors that were considered including the importance Sanford Airport has to aviation and the importance of both airports working together to attract as much new air traffic to the region as possible. He stated that mutual collaboration over an issue such as this will have much more positive results for Central Florida and would be a preferred method for resolving any real problems that may exist.

*Id.*  The GOAA Board agreed to have GOAA and SAA continue to talk about GOAA's concern.  *Id.*  Later that month, Mr. Bullock met with SAA's executives, and then the following day sent a letter on behalf of GOAA.  SOF ¶¶22-23. Through that letter, GOAA explained concern with confusion and stated:

> As our marketplace grows with the recently announced expansion plans by Walt Disney World and Universal, I believe there are opportunities for both airports to grow.  Areas of potential mutual interest could include the staffing of Federal agencies to assure that the customer using either airport receives a consistently high quality of service.  I also believe that there are potential joint operational considerations that could be addressed ranging from safety and security training to recommendations of the Sanford airport as an alternate airport for Orlando International Airport during irregular operations.  I also believe that there are some potential joint airport marketing opportunities which could allow the Central Florida area to optimize its airport resources.

SOF ¶23.  The two airports agreed to continue talking.  *Id.*

Two years later, in 1997, Mr. Bullock (the Executive Director) resigned, and was praised for *inter alia* "nutur[ing] [GOAA's] connection to the Central Florida

community." SOF ¶26. At that same meeting in November 1997, GOAA agreed to a "Sanford liaison" to help facilitate "discussion by the airport entities of specific programs or concerns." SOF ¶26. Metroplan (the Metropolitan planning organization for Orlando, Osceola, and Seminole counties) was to be the liaison. SOF ¶26. In December 1997, GOAA reported that both airports had funded this liaison. SOF ¶27. GOAA has no further records concerning this liaison. SOF ¶27. GOAA took no further action against SAA until it filed its TTAB oppositions in 2017. And it never filed any claim of trademark infringement or unfair competition until it filed its counterclaims in 2023. SOF ¶28. And in the intervening decades, both airports have flourished. SOF ¶46.

### D.    Allegiant Temporarily Uses MCO

Allegiant Airlines began to provide service to SFB in 2004. SOF ¶29. In 2010, Allegiant moved half of their operations from SFB to MCO. *Id*. Ten months later, Allegiant returned all of its Orlando-based passenger traffic to the Orlando Sanford International Airport. *Id*.

In 2015, GOAA began to track information about "Sanford Int'l / Allegiant Airlines" using an internal tool called the Palitos[5] report. SOF ¶30. The Palitos information does not report what the traveler's question about a particular topic was. SOF ¶31. For example, if a passenger asked "does Allegiant fly out of your

---

[5] Palitos is the Spanish word for tick or tickmark. SOF ¶30 n.1. An example form is attached as Exhibit 14 to SOF. The bulk of passenger questions relate to finding gates and baggage claims. In the 10 years since GOAA began tracking this information (2015-present), GOAA has lodged ~10k ticks in the "Sanford Int'l / Allegiant Airlines" box. During this same time period, GOAA has serviced 500,000,000 passengers. SOF ¶18. These ticks therefore account for ~10,000 / 500,000,000 travelers or approximately 0.002%.

airport," GOAA would put a tick in the "Sanford Int'l / Allegiant Airlines" box. *Id*. GOAA now claims that this information demonstrates confusion among the traveling public. SOF ¶30. While SAA strenuously disagrees, that dispute is outside the scope of this motion, which is focused only on GOAA's delay. GOAA's argument that this would evidence trademark confusion only further supports summary judgment on GOAA's delay here, as GOAA itself admits it believed the issue was serious enough to track it in 2015 but still it took no action until it filed its counterclaim almost a decade later.

### E.    GOAA Opposes SAA's Trademark Filings, but Still Does Not Assert Trademark Infringement

After the USPTO determined SAA's trademark applications were allowable, GOAA filed oppositions to them in 2017. SOF ¶¶ 33-36. The Board sustained GOAA's consolidated opposition and SAA filed this lawsuit to appeal the denial of its trademark applications. Dkt. 1; SOF ¶¶37-38. GOAA responded in 2023 by asserting counterclaims for trademark infringement and unfair competition – the first time in 27 years GOAA filed a claim seeking to challenge SAA's right to use its airport name. SOF ¶42.

## III.   <u>LEGAL STANDARD</u>

### A.    Summary Judgment

The Court is familiar with the summary judgment standards.

### B.    Laches

"The equitable defense of estoppel by laches may be applied to bar Lanham Act claims." *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp.,*

*LLC*, 7 F.4th 989, 1005 (11th Cir. 2021) (cleaned up). SAA must show: (1) GOAA delayed in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to SAA. *Kason Indus., Inc. v. Comp. Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997). "[T]he law is well settled that, where the question of laches is in issue [GOAA] is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Dropbox, Inc. v. Thru Inc.*, 2016 WL 6696042, at *3 (N.D. Cal. Nov. 15, 2016), *supplemented*, 2016 WL 7116717 (N.D. Cal. Dec. 7, 2016), *aff'd*, 728 Fed. Appx. 717 (9th Cir. 2018), and *aff'd*, 728 Fed. Appx. 717 (9th Cir. 2018).

## C.    Acquiescence

The defense of acquiescence requires proof of three elements: (1) the trademark owner actively represented it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the alleged infringer undue prejudice. *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1282 (11th Cir. 2012).

"Active consent does not necessarily mean an explicit promise not to sue. It only requires conduct on the [trademark owner's] part that amounted to an assurance to the [alleged infringer], express or implied, that [trademark owner] would not assert his trademark rights against the [alleged infringer]." *Id.* (quotations and citations omitted).

### D.    Common Law Trademark Infringement and Unfair Competition

To prove infringement, GOAA must show that SAA's use of the SAA Marks "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §1125(a)(1)(A); *Frehling Enterprises, Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). The court must analyze the following non-exhaustive factors: (1) the type of mark, (2) similarity of the parties' marks, (3) similarity of the parties' goods or services, (4) similarity of the parties' retail outlets and customers, (5) similarity of the advertising media, (6) the alleged infringer's intent in selecting its mark, and (7) actual confusion. *Frehling Enterprises*, 192 F.3d at 1335. Of these factors, "the type of mark and the evidence of actual confusion are the most important." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239 (11th Cir. 2008) (*citing Frehling Enterprises*, 192 F.3d at 1335). "Although likelihood of confusion is generally a question of fact, the issue may be resolved on summary judgment where the undisputed record evidence would lead a reasonable juror to only one conclusion." *Edge Systems LLC v. Aguila*, 186 F.Supp.3d 1330, 1349 (S.D. Fla. 2016) (citing *Tana v. Dantanna's*, 611 F.3d 767, 775 & n.7 (11th Cir. 2010)).

Although separate claims, the Eleventh Circuit evaluates trademark infringement and common law unfair competition together. *See e.g. Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1026 n.14 (11th Cir. 1989) ("[A]n unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim.").

## IV.  ARGUMENT

Summary judgment is appropriate here where there are no disputes of fact, let alone genuine disputes.

### A.    SAA is Entitled to Summary Judgment on Its Laches Defense

There is no question that GOAA delayed in asserting its supposed rights, it has no excuse for its delay, and SAA would be unduly prejudiced by permitting GOAA to resurrect claims GOAA gave up on 30 years ago.  "The first question, then, is whether [GOAA] has brought its claims within the applicable limitations period." *Dropbox, Inc.*, 2016 WL 6696042, at *3.

#### 1.    GOAA Delayed in Asserting Its Trademark Rights

The Court should start the calculation "from the time at which [GOAA] knows or should know [it] has a provable claim for infringement." *Kason Indus., Inc.*, 120 F.3d at 1206. Because the Lanham Act does not contain a statute of limitations, the delay is assessed against the limitations period for an analogous state law claim. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986). In Florida, this is four years. *Id.*; *see also* §95.11(7), Fla. Stat. Thus, a presumption of laches arises if GOAA files suit more than four years from the time GOAA knew or should have known it has a provable claim for infringement. *Kason Indus., Inc.*, 120 F.3d at 1206.  There is no dispute GOAA waited much longer than 4 years.

"Delay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008).  Under any time period GOAA will manufacture, it waited far too long to assert its rights.   The best

contenders for GOAA's clock are: (1) 1996 when Sanford rebranded as the Orlando Sanford International Airport; (2) 2012 when SAA began using the challenged logo; (2) 2015 when GOAA claims it started tracking "confused" Allegiant airlines customers; (3) 2017 when GOAA filed administrative opposition proceedings with the USPTO attacking SAA's trademark applications; or (4) March 19, 2019 when GOAA sued Melbourne for trademark infringement.  Under any of these calculations, the indisputable facts demonstrate that GOAA is well beyond the four-year limitations.  *See, e.g., Dropbox*, 2016 WL 6696042, at *3 (granting summary judgment because trademark infringement claims brought more than the applicable limitations period barred by laches).

There is no dispute that GOAA did not assert any claim of trademark infringement until it filed its counterclaims here on October 27, 2023.  This was 27 years after GOAA knew that Sanford called itself the Orlando Sanford International Airport.  This was 27 years after GOAA reached out and asked SAA if it would consider changing its name.  This was 27 years after GOAA paid its lawyers to advise it what to do about this nearby airport's rebranding.

Notably, in 1995, GOAA's lawyers advised it: "**If the [confusion] survey results show no significant level of confusion among Packagers and Travelers, it would be reasonable for GOAA to defer further action at that time**." SOF ¶20. One would think this explains why GOAA never brought a lawsuit against SAA. Even if it does, it doesn't explain why GOAA never did the recommended confusion survey. SOF ¶25. And it certainly does not explain why no trademark infringement action was brought by GOAA in any forum until 2023.  If GOAA

wanted to take action against SAA, it needed to do what its lawyers told it to do – investigate the potential for confusion, and then pursue it if confusion was "likely." GOAA chose not to do that (or secretly conducted such a survey and properly concluded there was no likelihood of confusion). It can't prejudice SAA by changing course now decades later.

Nor can GOAA get any saving grace through its trademark opposition filings. Those filings in 2017 were still 21 years after GOAA agreed to not interfere with SAA's name. But more pragmatically, a trademark opposition is not a claim of trademark infringement. *See e.g.* Trademark Trial and Appeal Board Manual of Procedure § 102.01 (attached as **Exhibit 27**) ("The Board is not authorized to determine the right to use, nor may it decide broader questions of infringement or unfair competition.")

In viewing the facts and all reasonable inferences in the light most favorable to GOAA, the indisputable facts establish that no later than 1996 GOAA was aware of SAA's use of "Orlando Sanford International Airport" in connection with its airport services. If GOAA wanted to pursue such a claim, it needed to do so by 2000. It didn't and is barred from doing so now.

### 2.    GOAA's Decades Long Delay Is Not Excusable

The excuse requirement ensures that "[a] trademark owner cannot simply wait without explanation to see how successful [an alleged infringer's] business will be and then [sue] to take away [the] good will developed by [the alleged infringer] in the interim." 6 *McCarthy on Trademarks and Unfair Competition* § 31:14 (5th ed. 2021). An excusable delay may be found when the parties are "in constant

communication, in an attempt to ascertain whether a peaceful co-existence [is] possible," *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1375 (S.D. Fla. 2014), or the case of progressive encroachment, "where an alleged infringer at first sold different products in a different market through different distribution channels later coming in direct competition with the plaintiff," *Kason Indus., Inc.*, 120 F.3d at 1206 (quotation omitted). The indisputable facts here preclude any such argument because the parties have not been involved in negotiations over the past 30 years nor was there any progressive encroachment – SAA has and continues to be involved in the business of operating an airport.

GOAA has demonstrated that it knows how to act quickly when it believes its supposed trademark rights are being infringed. When GOAA learned that Melbourne would be changing its name, GOAA immediately demanded it stop. *See* SOF ¶ 39 (Melbourne Complaint at ¶ 7 ("GOAA initially demanded MLB to cease all activities complained of herein *shortly after learning about the same* in 2015…")(emphasis added). This contrasts sharply with GOAA's 27 year delay in filing a trademark claim here.[6]

On advice of counsel, in 1995, GOAA reached out to Plaintiff. SOF ¶¶ 20-27. That was the last time Plaintiff heard from GOAA about an alleged likelihood of confusion, until 2017. SOF ¶28. GOAA offers no excuse for why it did not timely assert its trademarks rights. Instead, it appears clear that the airports discussed GOAA's issue at length, culminating in a decision for GOAA to take no action as

---

[6] It is outside the scope of this Motion as to whether GOAA has failed to comply with Fla. Stat. § 164.

reflected by GOAA taking no action and both airports flourishing. By GOAA's own admission, its Board was opposed to pursuing litigation against its neighbor airport. SOF ¶47. GOAA further admits that the respective Boards talked about how beneficial both airports are and could be to the Central Florida region, and how they could work together. SOF ¶¶23, 47. Indeed, the airports from the 1990s to present do share in federal resources such as customs and immigration. SOF ¶48. And they help one another with irregular operations by serving as reliever airports to each other. SOF ¶49.

In affirming summary judgment on laches, the Ninth Circuit in *Dropbox* noted that sporadic communications over a six-year period did not "escalate the communications to active settlement negotiations." *Dropbox*, 728 Fed. Appx. at 719. Worse, here, GOAA's sporadic communications occurred in 1995 and 1996 and fell off completely in the decades following and GOAA "chose to sit on the sidelines and do nothing" until the 2017 oppositions and 2023 when Plaintiff initiated this lawsuit. *Id.*

GOAA contends that it "should be entitled to additional deference on defenses relating to alleged delays because of its position as a public agency with duties to carefully manage its expenditures on the public's behalf." **Exhibit 8** at 6. GOAA cites *Univ. of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1041 (3d Cir. 1982) for this proposition. But the Third Circuit in *Univ. of Pittsburgh*, did not remand the case on consideration of the character of the plaintiff-trademark owner as a public university. In fact, the Third Circuit **affirmed** the district court's ruling that the plaintiff's trademark infringement and unfair competition **claims are**

**barred by laches in all respects except** that the district court erred in applying the doctrine of laches to bar plaintiff's claims for **prospective injunctive relief**. *See Univ. of Pittsburgh*, 686 F.2d at 1041 (3d Cir. 1982).

GOAA's misreading of *Univ. of Pittsburgh* does not cure the delay because even under *Univ. of Pittsburgh*, GOAA's trademark infringement and unfair competition claims are barred by laches which precludes the accounting for past infringement GOAA seeks (Dkt. 13 at Prayer for Relief §iii). *See also Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC,* 7 F.4th 989, 1005 (11th Cir. 2021) (affirming district court's conclusion that the doctrine of laches bars plaintiff's claims for monetary damages for trademark infringement and unfair competition). But, when a trademark owner – like GOAA – "sleeps on his rights for a period of time greater than the applicable statute of limitations, the burden of proof shifts to the [trademark owner] to prove the absence of such prejudice to the defendant as would bar **all relief**." *Univ. of Pittsburgh,* 686 F.2d at 1041 (internal quotations and citations omitted and emphasis added).  And, GOAA's reliance on *Univ. of Pittsburgh* is further belied by the fact that SAA itself is also a government entity, and accepting GOAA's logic would suggest that one government is superior to another.

In *Kars 4 Kids Inc. v. Am. Can!,* 8 F.4th 209, 221–22 (3d Cir. 2021), the undisputed facts were that America Can observed what it believed to be infringing behavior in 2003 and sent a cease and desist letter. *Id.* Then, "a total of twelve years elapsed before America Can filed suit." *Id.* The court found that America Can's delay was inexcusable. *Id.; see also Pinnacle,* 7 F.4th at 1005 (five-year delay

inexcusable); *IP-6 Int'l, Inc. v. Nutrigold, Inc.*, 2023 WL 9958386, at *2 (M.D. Fla. Mar. 31, 2023) (nine-year delay inexcusable). Here, too, the Court should find that GOAA's 20+ year delay was inexcusable.

### 3.    SAA Has Suffered and Will Continue to Suffer Undue Prejudice If GOAA's Claims Are Allowed

"Courts have previously recognized two categories of prejudice caused by a delay in bringing a trademark infringement suit—evidentiary prejudice and economic prejudice." *Pinnacle,* 7 F.4th at 1009 (citing 6 *McCarthy on Trademarks and Unfair Competition* § 31:12 (5th ed. 2021) ("Evidentiary prejudice encompasses such things as lost, stale or degraded evidence or witnesses whose memories have faded or who have died. Economic or expectation-based prejudice encompasses actions made by the defendant that it would not have taken or consequences it would not have experienced had the plaintiff brought suit promptly.").

Here, SAA has suffered both evidentiary and economic prejudice as a result of GOAA's decades-long delay. At the time of discovery in this case, it had been 28 years since 1996 and many of GOAA's board members involved in obtaining GOAA's Legal Opinion – and the decision not to pursue a claim against SAA in 1996 – have died. SOF ¶¶19-28. There is no question that in the 1990s GOAA and SAA spent considerable time talking about GOAA's concerns. And there is no question they came to some understanding, resulting in peaceful coexistence of the airports for decades. The specific details of all discussions that took place are lost to time, and SAA suffers evidentiary prejudice should GOAA be permitted to reverse the course it steered peacefully for decades.

SAA has additionally spent considerable time, money, and other resources developing its brand and as a result has gained substantial goodwill.  *See* **Exhibit 25**, Decl. at ¶ 15.  For example, Metroplan (the metropolitan organization) has reported for years that "One of the Orlando Metropolitan Area's strengths is its rich transportation network.  With large numbers of tourists, business travelers, and residents around Orlando, the area's airport**s**, railroads, and seaport are crucial to the local economy."  SOF ¶45 (emphasis added).  Metroplan continues: "Orlando Sanford International Airport … began as a facility primarily for international chartered and scheduled air flight to and from Europe, has developed into an alternative to Orlando International for many metro residents." **Exhibit 21** at 43 (SANFORD-MDFLA-001789).

Additionally, SAA's trademark registration applications were approved by a USPTO examining attorney (prior to GOAA's opposition). And, since 2017, SAA has been forced to defend against two opposition proceedings initiated by GOAA and against the claims in the Counterclaim. Undoubtedly, the hardship on SAA if required to change its mark – after thirty years – seriously outweighs the hardship on GOAA caused by SAA's use of the mark. *See* **Exhibit 25**, Decl. at ¶ 15.

GOAA's claims fall outside the expiration of the four-year limitation period regardless of when the Court determines that GOAA knew or should have known of a possible infringement claim. The Court should find that this disadvantage amounts to undue prejudice. *See, e.g., Dropbox*, 728 Fed. Appx. at 719 (unreasonable delay prejudiced Dropbox because "[Dropbox] spent millions of dollars developing its services and established itself as a leader in the file-sharing

industry. Such significant investment is sufficient to show prejudice.")．GOAA's claims are barred by laches and SAA is entitled to summary judgment.

### B.    GOAA Acquiesced to SAA's Airport Name

There is no question that (1) GOAA actively represented it would not assert a right or claim; (2) the delay between the active representation and assertion of its trademark infringement claim was not excusable; and (3) the delay has caused SAA undue prejudice.

"The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent." *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir.1991). "Active consent . . . only requires conduct on the [trademark owner's] part that amounted to an assurance to the [alleged infringer], express or implied, that [trademark owner] would not assert his trademark rights against the [alleged infringer]." *Univ. of Ala. Bd. of Trustees,* 683 F.3d at 1282 (quotations and citations omitted).

### 1.    GOAA's Acquiescence for Over Two Decades Was a Representation that GOAA Would Not Assert a Claim

The same indisputable facts discussed above demonstrate GOAA's acquiescence. GOAA cannot credibly dispute the basic timeline which established that: in 1995, GOAA learned of SAA's proposed mark, by 1996 GOAA knew it had a possible claim of infringement, but took no action until 2017 when it opposed registration of the Marks or until 2023 when it filed a Counterclaim for trademark infringement and unfair competition.

During that time, and beginning in 1995, GOAA obtained legal advice about what to do. SOF ¶19. GOAA board members met with SAA's executives regarding the possible likelihood of confusion on at least two occasions and threatened to (but didn't) bring a lawsuit to stop the name change. SOF ¶¶22-23. GOAA never undertook a confusion survey. SOF ¶25. GOAA's influential Board member opposed bringing any claim against SAA. SOF ¶47. GOAA chose not to act. A consequence of that decision is GOAA cannot, 30 years later, decide it wants to deprive SAA of the rights SAA built based on GOAA's inaction.

By 1997 – two years after GOAA learned of SAA's proposed mark and one year after SAA changed its airport name – GOAA established a "Sanford Airport Liaison" to facilitate discussion with Plaintiff on "specific programs or concerns." SOF ¶26. It is unclear to SAA whether the objectives of this liaison were fulfilled and if those objections were related to GOAA's concerns of a likelihood of confusion at all. But one thing is clear: SAA never heard from GOAA again until the 2017 oppositions. SOF ¶28.

During this extensive time period, SAA was left to believe that, by GOAA's acquiescence, GOAA would not assert its trademark rights against SAA.[7] *See Univ. of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1282 (11th Cir. 2012) (active consent can be express or implied).

---

[7] Upon information and belief, Robert (Bob) Hattaway, former Chairman of GOAA, had personal knowledge concerning GOAA's decision not to pursue legal action against Plaintiff after GOAA first learned of the name change. Mr. Hattaway died on November 22, 2024.

**2.    GOAA's Delay Is Inexcusable**

As demonstrated in section IV.A.2 *infra*, GOAA has no excuse for its delay.

**3.    GOAA's Delay Caused Plaintiff Undue Prejudice**

As demonstrated in section IV.A.3 *infra*, Plaintiff is unduly prejudiced by GOAA's inexcusable delay and will continue to be harmed if GOAA's claims are allowed.

There are no genuine disputes of material fact.  SAA is entitled to summary judgment in its favor on GOAA's Counterclaims.

**C.    SAA is Entitled to Summary Judgment on Defendant's Counterclaim for Likelihood of Confusion Because the Most Important Factor – Actual Confusion –Weighs Heavily in Plaintiff's Favor Where the Marks Have Co-Existed for Nearly Thirty with *De Minimis* Actual Confusion, If Any**

Despite nearly 30 years of the marks' coexistence in the marketplace, GOAA can point to no meaningful instances of actual confusion. Such extended co-existence without confusion is strong evidence that confusion is unlikely. *See, e.g., Tana v. Dantanna's*, 611 F.3d 767, 779 (11th Cir. 2010) ("Dantanna's has served over one million customers in the five years between its opening and the filing of this lawsuit; no reasonable jury would conclude that an inquiry by only two customers of a possible connection between the restaurants demonstrates actual confusion in the consuming public."); *Sun Banks v. Sun Fed. Sav. & Loan,* 651 F.2d 311, 319 (5th Cir. 1981) (finding 19 instances of actual confusion insufficient); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir. 1980) ("the fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against

likelihood of confusion in the future"); *see also Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999) (concluding that evidence of only two consumers who were confused was "minimal" and did not prevent dismissal on summary judgment).

GOAA has offered scant evidence of supposed consumer confusion, because it simply does not exist. But taking GOAA's best case, it offers evidence from its Palitos system, a handful of social media exchanges, and a couple of documents reflecting issues passengers on Allegiant Airlines experienced. SAA vigorously disputes that any of these events constitute confusion from a trademark perspective, and reminds the Court that fleeting misstatements, momentary confusion, inattentiveness, or carelessness are not trademark confusion. *See e.g. DORPAN, SL v. Hotel Melia, Inc.*, 728 F.3d 55, 64-65 (1st Cir. 2013); *Future Proof Brands, LLC v. Molson Coors Bev. Co.*, 982 F.3d 280, 297 (5th Cir. 2020); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002). "Not all conceivable forms of confusion are relevant to trademark infringement." *Uber Promotions, Inc. v. Uber Tech., Inc.*, 162 F. Supp. 3d 1253, 1272 (N.D. Fla. 2016) (quoting *Dorpan*, 728 F.3d at 64-65).

But even looking at GOAA's evidence in the light most favorable to it, as the Court must, it still demonstrates there is not a ***likelihood*** of consumer confusion. GOAA's evidence ignores the elephant in the room. Over the nearly 30 years of coexistence between the airports, Defendant has serviced significantly more than half of a billion travelers. SOF ¶18 Even if Defendant's evidence were evidence of trademark confusion (and it most assuredly is not), the at most 15 incidents out of

23

500,000,000 travelers does not even rise to the level of *de minimis* (representing 0.000003% of Defendant's total travelers). And giving GOAA an even bigger benefit of the doubt, by presuming every question it ever received about "Sanford Int'l / Allegiant Airlines" had anything whatsoever to do with trademark confusion[8], those 10,000 requests over a 10-year period compared against 500,000,000 travelers is miles below any *de minimis* standard. Simply put, the market has clearly demonstrated that there is no confusion. *See, e.g., T.G.I Friday's, Inc. v. Int'l Rest. Grp., Inc.*, 405 F. Supp. 698, 707 (M.D. La. 1975) (finding evidence that a few restaurant suppliers misdirected billings is *de minimis* and immaterial to the issue of likelihood of confusion); 3 McCarthy § 23:14 ("Evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*").

GOAA offers no surveys or direct evidence showing that consumers recognize SAA's Mark as referring to GOAA and its airport services. GOAA offers no evidence relating to how consumers search for air travel, and whether or not airport names weigh in on that decision at all. Indeed, the fact that the best that GOAA can do is present a dozen or so social media posts, despite 30 years of possibility for consumer confusion to run rampant, demonstrates authoritatively that there is no likelihood of confusion between the parties' marks.

Because the test of trademark infringement concerns a prediction of whether or not competing marks will create a likelihood of consumer confusion in the

---

[8] This is a huge assumption. GOAA agrees that simple questions like: "does Allegiant fly out of your airport?" will result in a tick in this part of the form. SOF ¶ 31.

marketplace, GOAA's ~30-year delay in asserting its rights gave the market an ample opportunity to weigh in on whether airports that use geographic indicates in a particular market are likely to cause confusion. GOAA's own lack of evidence demonstrates, that at least with SAA's Orlando Sanford International Airport mark, the market is comfortable with it, and it causes no confusion with GOAA's airport branding. SAA is entitled to summary judgment.

## V.    **CONCLUSION**

Plaintiff, Sanford Airport Authority, respectfully requests that this Court grant this Motion for Summary Judgment in favor of Sanford and against Defendant, and for such other and further relief as this Court deems just and proper.

Date: March 17, 2025
*/s/ Woodrow H. Pollack*
Woodrow H Pollack
Lead Counsel
Fla. Bar No.: 026802
**SHUTTS & BOWEN LLP**
4301 W Boy Scout Blvd, Suite 300
Tampa, Florida 33607
wpollack@shutts.com
(813) 463-4894

Brett Renton
Fla. Bar No.: 41994
**SHUTTS & BOWEN LLP**
300 S. Orange Avenue, Suite 1600
Orlando, Florida 32801
brenton@shutts.com
(407) 423-3200

Jodi-Ann Tillman
Fla. Bar No. 1022214
**SHUTTS & BOWEN LLP**
201 East Las Olas Boulevard
Suite 2200
Fort Lauderdale, Florida 33301
jtillman@shutts.com
(954) 524-5505

*Attorneys for Plaintiff*
*Sanford Airport Authority*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on <u>March 17, 2025</u> a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ Woodrow H. Pollack</u>

## SERVICE LIST

Stephen H. Luther, Esq.
Florida Bar No. 528846
**LUTHER LAW PLLC**
4767 New Broad Street, # 1029
Orlando, FL 32814
407 501-6711 x101 (Main)
407 501-7049 (Direct)
sluther@lutherlawgroup.com

*Attorneys for Defendant Greater Orlando Aviation Authority*