## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**Sanford AIRPORT AUTHORITY,**

        **Plaintiff,**              **CASE NO.: 6:23-cv-1563-PGB-DCI**

**v.**

**GREATER ORLANDO AVIATION
AUTHORITY,**

        **Defendant.**

_____/

## THE GREATER ORLANDO AVIATION AUTHORITY'S
## <u>MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT</u>

Defendant/Counterclaim Plaintiff the Greater Orlando Aviation Authority ("GOAA"), through its undersigned counsel, hereby submits the following Motion and Memorandum for Summary Judgment in the lawsuit with the Sanford Airport Authority ("Sanford").

## TABLE OF CONTENTS

**INTRODUCTION**………………………………………………………………………..1

**ARGUMENT**………………………………………………………………………...6

  **I. The Likelihood of Confusion Factors Show Infringement**…………….6

    **A. Four of the Seven Factors Clearly Favor GOAA (Factors 2-5)**……..7

    **B. The Evidence of Actual Confusion is Compelling (Factor 7)**……..8

    **C. Intent: Sanford is, at Best, Willfully Blind to the Harm it**

i

**Causes (Factor 6)**...……………………………………………………..12

**D. The Orlando International Airport Marks Are Strong (Factor 1)**……………………………………………………………18

**II. The Court Should Grant a Permanent Injunction Against Infringement**...………………………………………………………21

## TABLE OF AUTHORITIES

<u>Cases</u>

*Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008)……………………………………………………………22

*Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992)……………………………………………………………..7

*Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991)……………………………………………………………..13

*City & Cnty. of San Francisco v. City of Oakland,* No. 24-CV-02311-TSH, 2024 WL 4775737, at *6 (N.D. Cal. Nov. 12, 2024)…………………………………18

*Duncan McIntosh Co. Inc. v. Newport Dunes Marina LLC*, 324 F. Supp. 2d 1078 (C.D. Cal. 2004), aff'd, 120 Fed. Appx. 119 (9th Cir. 2005)…………………18

*Edge Sys. LLC v. Aguila*, 186 F. Supp. 3d 1330, 1362 (S.D. Fla. 2016), aff'd, 708 Fed. Appx. 998 (Fed. Cir. 2017)……………………………………..22

*Frehling Enterprises, Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999)……………………………………………………………...12

*Gulf Coast Commercial Corp. v. Gordon River Hotel Assoc.*, 508 F. Supp. 2d 1157, 1163 (M.D. Fla. 2007)……………………………………………………………19

*Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1207

(11th Cir. 1997)……………………………………………………………………….23

*Pinnacle Advertising and Marketing Group, Inc. v. Pinnacle Advertising and Marketing Group, LLC*, 7 F.4th 989, 1011, 110 Fed. R. Serv. 3d 657 (11th Cir. 2021)…………………………………………………………………..23

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1287 (11th Cir. 2020)……………………………………………………………………7, 18

*Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.*, No. 81 CIV. 0178, 1982 WL 51044, at *4 (S.D.N.Y. Dec. 9, 1982)…………………………………………13

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996)……………………………………………………………………….. 22

*Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1355 (11th Cir. 2007)……………..6, 7

<u>Statutes</u>

15 U.S.C. § 1125(a)…………………………………………………………………6

## TABLE OF EXHIBITS

Exhibit A – Joint Stipulation of Undisputed Facts (the "SOF")

Exhibit B – Declaration of  Jeremy Harris ("Harris")

> Exhibit 1 to the Harris Declaration – Registration Certificate for GOAA's Orlando International Airport Design Mark

> Exhibit 2 to the Harris Declaration – Composite Exhibit of Advertising and Marketing Material for the Orlando International Airport Mark

> Exhibit 3 to the Harris Declaration -- Website Screenshots From Social Media Showing Use of the Orlando International Airport Mark

> Exhibit 4 to the Harris Declaration – File History for the Orlando International Airport & Design Mark

Exhibit 5 to the Harris Declaration – Consent and License Agreement Between the Orlando International Airport and the Melbourne Airport Authority

Exhibit 6 to the Harris Declaration – Composite Exhibit of Successful Trademark Enforcement Efforts for the Orlando International Airport Mark

Exhibit 7 to the Harris Declaration – Composite Exhibit of Trademark Confusion Complaints Submitted to the Orlando International Airport

Exhibit 8 to the Harris Declaration – Composite Exhibit of Social Media Posts Showing Trademark Confusion

Exhibit 9 to the Harris Declaration – Palitos Report from GOAA's Information Desk Showing Instances of Sanford/Allegiant Confusion by Year

Exhibit 10 to the Harris Declaration – GOAA Information Desk Manual with Directions on How to Handle Sanford Confusion Inquiries

Exhibit 11 to the Harris Declaration -- GOAA's Information Desk Directory With Map of the Sanford Airport

Exhibit 12 to the Harris Declaration - Minutes of the March 7, 1995 Board Minutes of the Sanford Airport Authority

Exhibit 13 to the Harris Declaration – Memorandum of June 14, 1995 from GOAA's General Counsel, Egerton van den Berg, Regarding Potential Confusion

Exhibit 14 to the Harris Declaration – Letter of June 30, 1995 from GOAA Board Chairman, Bob Hattaway, to Stephen J. Cooke at the Sanford Airport Authority

Exhibit C – Order of the Trademark Trial and Appeal Board Denying Registration for the Sanford Orlando International Airport Marks (the "TTAB Order")

Exhibit D – Deposition of Jeannette Selligson as the Corporate Representative of Enterprise Leasing Company of Orlando, LLC (the "Enterprise Depo")

Exhibit E – Exhibit 2 to the Enterprise Depo Compiling List of Cars Booked at One Airport and Picked Up at the Other

Exhibit F – Deposition of Sarah Richardson as the Corporate Representative of Allegiant Airlines (the "Allegiant Depo")

Exhibit G – Excerpts From the Deposition of Jennifer Janchar as the Corporate Representative of Allegiant Airlines (the "Janchar Depo")

Exhibit H – Exhibit 2 to the Deposition of the Corporate Representative of Allegiant Airlines

Exhibit I –Deposition of the Corporate Representative of the Sanford Airport Authority (the "Sanford 30(b)(6)")

Exhibit J – Excerpts From the Deposition of Eyad Abbouhannoud as the Corporate Representative of the Hertz Corporation (the "Hertz Depo")

Exhibit K – Excerpts From the Deposition of Betty Cardenas-Quintero (the "Cardenas Depo")

Exhibit L – Declaration of Paola Mastrantonio-Desantis (the "Mastrantonio Decl.")

Exhibit M  -- Declaration of Magda Bazelais (the "Bazelais Decl.")

Exhibit N – Deposition of Confusion Witness, Lee Hoffman

Exhibit O – Deposition of Confusion Witness, Thomas Woodle

Exhibit P – Deposition of Confusion Witness, Edward Lawson

Exhibit Q – Deposition of Lauren Rowe as the Corporate Representative of the Sanford Airport Authority (the "Rowe Depo")

Exhibit R – GOAA Second Supplemental Rule 26 Disclosures

Exhibit S –Expert Report of Sarah Butler on the Strength of the Orlando International Airport Mark (Excluding Lengthy Exhibits)

Exhibit T – Sanford's Supplement Response to GOAA's First Interrogatories.

## INTRODUCTION

This litigation is an appeal of the Trademark Trial and Appeal Board's (the "TTAB") decision denying Sanford registration for its Orlando Sanford International Airport Marks[1] because they are likely to be confused with GOAA's Orlando International Airport Marks[2] (see Doc. 1 and Ex. C hereto; SOF, ¶¶ 5-9), and GOAA's counterclaim for trademark infringement seeking damages and injunctive relief to bar Sanford from continuing to use its Orlando Sanford International Airport Marks. (Doc. 13). Although subject to *de novo* review, the TTAB's Order merits consideration because it is a considered, sixty-page Order from the federal government's foremost authority on trademarks and confusion after six years of litigation. The TTAB ruled decisively in GOAA's favor on almost every issue, and this decision and the arguments set forth below provide a compelling basis for the Court to affirm the TTAB's decision, find infringement and enjoin Sanford's continued infringement.

The main difference between the evidence before the TTAB and this Court is the far greater and more compelling evidence of actual confusion before the

---

[1] The Orlando Sanford International Airport Word Mark and the Orlando Sanford International Airport Design Mark. *See* Joint Stipulation of Material Facts, Ex. A ("SOF"), ¶¶ 5-6.

[2] The Orlando International Airport Word Mark and the Orlando International Airport Design Mark. *See* SOF, ¶¶ 2-3.

Court now. The TTAB found in GOAA's favor on actual confusion based on a much more limited record. (TTAB Order at 52). Since that decision, GOAA has obtained far more evidence of confusion. Enterprise's representative testified to 663 instances of cars being booked at the wrong airport between Orlando International Airport and the Orlando Sanford International Airport – all in just the last year. (Enterprise Depo, Ex. D, p. 10 at 21 – p. 13 at 9).[3] Although only some of these unlucky souls stated they were confused by Orlando in the airport name, this does not happen with other airports, thus leaving confusion over the name as the only plausible explanation. (Id, p. 18 at 1 – p. 20 at 12). The testimony was the same from Hertz in estimating mistaken bookings between the airports at an average of five times a week, an average of 510 each year. (Hertz Depo, Ex. J, p. 15 at 5 - 19). With only 365 days in a year, this is daily to near daily confusion, and in the context in which many travelers here are families, often struggling with children, strollers, golf clubs and luggage, only to find themselves over thirty miles away from the place from which they booked a reservation for, say, a rental car. Many of these travelers are also coming to Orlando for its theme parks which are well south of Orlando and are often an hour or more drive away from Sanford's airport, depending on traffic. (Harris, ¶ 57).

---

[3] As it did in the Opposition Proceeding, Sanford will presumably argue that GOAA's confusion evidence is inadmissible hearsay. The Court should reject these arguments for the same reasons the TTAB did. (TTAB Order at 42 – 50).

Allegiant – the only scheduled service carrier[4] in common between GOAA and Sanford – also provided "an estimate of 25% of flights we experience 1 or more passengers displaced due to this [confusion] mistake." (Allegiant Depo, Ex. F, p. 21 at 10 to p. 21 at 19; Ex. H hereto) (brackets added). Where Sanford has at least four and often up to 30 Allegiant flights per day, this is daily to near daily confusion. (Sanford 30(b)(6), Ex. I, p. 53 at 8 - 18). And, again, this is happening in a context where people find themselves many miles from where they think they are, with the burdens of time restrictions and other travel stressors.

Similarly, and not surprisingly, GOAA's records from its information desk show <u>over 10,000 passengers making inquiries to GOAA about Sanford, at least the majority of which are instances of confusion.</u> (Harris, Ex. B, ¶ 46 and Harris Ex. 9; Cardenas, Ex. K, p. 97 at 14 – p. 98 at 22). The problem became serious enough that GOAA added a special segment to its information desk staff training to deal with the "confusion between the Orlando International Airport and the Orlando Sanford International Airport [that] happens on a daily or near-daily basis." (Mastrantonio Decl., Ex. L, ¶¶ 4-9)(brackets added). GOAA's information desk staff estimate "that 9 out of every 10 people we see who confuse the Orlando International Airport with the Orlando Sanford International Airport end up not

---

[4] "Scheduled service" means flights operated according to a pre-published timetable, typically from major airlines like Delta or Allegiant, as opposed to individual flights or charter/package group tour flights. (Harris, ¶ 48).

having enough time to make their flight." (Mastrantonio, ¶ 10). Imagine the real-life impacts on everyday travelers, to discover, too late to correct the errors, that it is impossible to make their flights, or check their luggage, or readily fix the problems, caused unnecessarily by this airport-name confusion.

In addition to testimony from rental car companies, GOAA's information desk, Allegiant and others, this Court has before it testimony from actual customer, every one of which testified they were confused as to which airport was their airport because of Sanford's nearly identical marks. *See e.g.,* (Hoffman Depo, Ex. N, p. 10 at 4 – p. 17 at 11 - "I booked a flight out of Sanford International Airport, not realizing it was Sanford, and I mistakenly went to Orlando International Airport."; Woodle Depo, Ex. O, p. 12 at 16 - p. 16 at 23 "The Orlando being prominent in the name led us to believe that we were flying into Orlando International" when they flew to Sanford; SOF 29; Lawson Depo, Ex. P, p. 9 at 19 – p. 10 at 11 - "So I looked up Orlando, and it said Orlando Sanford. I thought it was the same thing. I don't know the state of Florida. Therefore, I flew into the wrong airport.").

When faced with the evidence of actual – not hypothetical or theoretical – confusion, what did Sanford do to investigate whether its choice of mark was harming customers?  The answer: essentially nothing (*see* Section I(C) below). Sanford never agreed to the joint survey GOAA requested, has never tried to track

instances of confusion like GOAA has, and made little virtually no effort to investigate confusion even after extensive reports of confusion from rental car companies, Allegiant Airlines and others. (*See* Section I(B)below).

In addition to studiously avoiding evidence of confusion, Sanford has also not tried to reduce it. When GOAA asked Sanford to join in asking Allegiant to add a statement to its website to reduce confusion, Sanford declined to join, arguing it was "absurd" and "might change their [the consumer's] mind about which airport they book." (Sanford 30(b)(6), p. 119 at 10 – p. 124 at 5)(brackets added). But that is the whole point. When consumers are confused between Orlando or Sanford, a statement like this could save the consumer from being on one of the "25% of flights" i.e., Allegiant flights on which a passenger is confused. (Ex. H). That Sanford will not join in asking for even this simple, basic step to reduce confusion speaks volumes about its lack of concern about consumer confusion and the danger of allowing it to continue confusing customers using Orlando in its airport name.

The reason Sanford has studiously avoided any inquiry into confusion and is unwilling to engage in even the most basic steps to reduce confusion became clear when its representative was asked if it would be a problem if 100 percent of its customers were confused. Sanford responded as follows: "I don't know that I would call that a problem. We'd be happy…" (Sanford 30(b)(6), p. 84 at 9-16)

(emph. added). In other words, Sanford has bet (with almost cavalier disregard from the impact this decision has on its customers) that confusion in the marketplace benefits Sanford and not Orlando, making Sanford "happy" with more sales. This testimony also speaks volumes about Sanford's intent: unless this Court stops Sanford's infringement, it will studiously ignore harm to consumers in favor of a few more dollars in its coffers. Where confusion is happening on a daily to near daily basis and Sanford will do nothing to stop it, or even try, the case for finding infringement and enjoining Sanford's conduct is clear.

## ARGUMENT

### III.    The Likelihood of Confusion Factors Show Infringement.

To prevail on a claim of trademark infringement under federal law, GOAA must show: (1) that its marks had the right to protection, and (2) that the defendant used marks that were identical with the plaintiff's marks, or so similar that they were likely to confuse consumers. *See* 15 U.S.C. § 1125(a); *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1355 (11th Cir. 2007).  Here, the Orlando International Airport marks have the right to protection. (*See* Section I(D) below).  To show "likelihood of confusion" requires this Court  to balance these seven factors:

> (1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity of the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6)

defendant's intent to misappropriate the plaintiff's good will; and (7) actual confusion in the consuming public.

*See Welding Servs., Inc. v. Forman,* 509 F.3d 1351, 1360 (11th Cir. 2007). No single factor is dispositive, but the strength of the mark (factor 1) and actual confusion (factor 7) are generally the most important. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.,* 983 F.3d 1273, 1287 (11th Cir. 2020). These factors overwhelmingly favor GOAA.

### A. Four of the Seven Factors Clearly Favor GOAA (Factors 2-5).

Although the parties dispute whether strength of the mark, intent, and actual confusion favor GOAA, the other four factors favor GOAA. "When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of Am.,* 970 F.2d 874, 877 (Fed. Cir. 1992). Sanford's marks incorporate GOAA's Orlando International Airport Word Mark in its entirety (factor 2) with one additional descriptive word, "Sanford," for the same services. (Harris, ¶ 30; SOF 22). For Sanford's design mark, and as the TTAB correctly found, the "literal elements ORLANDO INTERNATIONAL AIRPORT are the dominant portion of the mark because consumers will request or discuss the services by the literal components." (SOF 22; Mastrantoni Decl., Ex. L, ¶ 7; TTAB Order, Ex. C, p. 35). The marks are highly similar, and the additions to Sanford's design mark are in much smaller font and will not dispel confusion. Both airports

7

provide the same airport services (factor 3). (Rowe Depo, Ex. Q, p. 9 at 22 – p. 10 at 17; Harris, ¶ 31; TTAB Order at 21). Both airports promote these services to the same customers at all levels of sophistication and through the same advertising and the same channels of trade largely because "[e]very airport does the same thing, really." (factor 4). (SOF, ¶¶ 15-20 and 23-26; Rowe, p. 10 at 18 – p. 16 at 10, p. 20 at 14 – p. 21 at 24, p. 26 at 19 – p. 29 at 15;  Harris, ¶¶ 13 – 17 and 32 - 35, ; TTAB Order at 21). Four of the seven factors – a majority – therefore clearly favor GOAA.

### B.  The Evidence of Actual Confusion is Compelling (Factor 7).

GOAA and Sanford agree on at least one point: that this case can be resolved on evidence of actual confusion, as Sanford claims in its summary judgment motion. (Doc. 35 at  22-25). The TTAB found actual confusion weighs in GOAA's favor on a far more limited confusion record than that before this Court. (TTAB Order at 39 – 53). When that evidence is combined with all the additional evidence below showing daily confusion, this factor unquestionably favors GOAA.

Enterprise Rent-A-Car found 663 instances of customers booking at one of the two airports and then trying to pick up their car at the other in just the last year. (Enterprise Depo, Ex. D, p. 10 at 21 – p. 13 at 9; Ex. E hereto (Ex. 2 to the depo)). Several customers stated that they were confused by both airport having Orlando in their airport name, such as "I realize now I booked it at the other

airport." (Enterprise, p. 18 at 1 - 20). Even if they had not, this confusion is only happening between Orlando and Sanford, and Enterprise has seen nothing like this between Sanford and any other airports. (Enterprise, p. 19 at 3 – p. 20 at 4). The implication is clear: many hundreds of people a year, on a daily to near daily basis, are booking their cars at the wrong airport between Orlando and Sanford with Enterprise because of the nearly identical airport names, and it is not happening between Sanford and other airports because the names are not similar.

Hertz' representative had similar testimony. He estimated that people booked the wrong airport between Orlando and Sanford an average of five times a week, or 510 a year. (Hertz Depo, Ex. J, p. 15 at 5 - 19). Although he could not say what caused the confusion, the next largest number of bookings at the wrong airport was roughly half this amount at about three times per week. (Hertz, p. 16 at 22 – p. 17 at 5). The implication here is also clear: Customers are booking their rental car at the wrong airport between Orlando and Sanford because of the nearly identical airport names. Common sense suggests this would happen: Orlando is well-known and one of the top destinations for travelers in the world; that is what people seek when they are making travel decisions. To know that the inclusion of "Sanford" in the title means you are dozens of miles from your intended destination if you travel there, you need to have actual knowledge that "Sanford"

is nowhere near Orlando, and even further from the theme parks that many visitors are coming to Orlando to visit. (Harris, ¶ 57; Rowe, Ex. Q, p. 15 at 3-9).

The evidence from Allegiant also shows daily to near daily confusion. When GOAA asked "if Allegiant has had to field any passenger complaints regarding airport confusion between MCO [the Orlando International Airport] and SFB [the Orlando Sanford International Airport]" Allegiant responded that, on "an estimate of 25% of flights we experience 1 or more passengers displaced due to this mistake." (Allegiant Depo, Ex. F, p. 21 at 10 to p. 21 at 19; Janchar Depo, Ex. G, p. 14 at 2 to p. 15 at 14; Ex. H). "Displaced" is a simple word, but again, common sense yields in any traveler's mind just what a consumer hardship occurs when this displacement occurs. You're not only on the wrong flight, you're in the wrong airport.

In the early years of Sanford's use of Orlando in its airport name, GOAA did not see significant confusion between the airports over the name similarity, likely because Sanford did not, at least to GOAA's knowledge, have "scheduled service" carriers like Allegiant and was focused on package tour operators where confusion is much less likely. (Harris, ¶ 48). When GOAA began to see more passenger confusion between Orlando and Sanford, GOAA added a "Sanford Int'l/Allegiant" field to its list of issues handled by GOAA's information desk in 2015. (Harris, ¶ 46). At least the majority of the check marks added to this field

10

were for people confused between the Orlando and Sanford airports because of the similarity in the names. (Quinteros Depo, Ex. K, p. 97 at 14 - p. 98 at 22). To the extent this list may be somewhat over-inclusive by including people who had Sanford inquiries but were not confused, that is more than offset by the fact that each group of confused passengers gets only one check mark on the Palitos form, while the average passenger group size at Orlando International is three people. (Harris, ¶ 47). GOAA's Palitos reports also show at least hundreds and often thousands of people per year who were confused between Orlando and Sanford because of the similarity of the airport names for over 10,000 instances in the last 10 years. (Harris, ¶ 46; Harris Ex. 9).

GOAA, concerned about passenger confusion, added a special segment to its information desk staff training to deal with the "confusion between the Orlando International Airport and the Orlando Sanford International Airport [that] happens on a daily or near-daily basis." (Mastrantonio Decl. at Ex. L, ¶¶ 5) (emph. added); Bazelais Decl., Ex. M, ¶¶ 5-12). GOAA also created an information desk manual instructing staff how to handle Sanford trademark confusion (Harris Ex. 10) and a directory to help customers that includes only one map of another airport: a map showing Sanford's airport, again because that is the only airport where GOAA has seen anything like this level of confusion. (Harris, ¶ 49; Harris Ex. 11). GOAA's information desk staff estimated "that 9 out of every 10 people

11

we see who confuse the Orlando International Airport with the Orlando Sanford International Airport end up not having enough time to make their flight," not surprising since the Sanford airport is over 30 miles from the actual Orlando airport. (Mastrantonio Decl., Ex. L, ¶ 10). A host of social media posts also show confusion between the two airports with comments such as "apparently there are 2 airports in Orlando [..] Yeah, I'm at the wrong one" and "I landed at Orlando/Sanford My rental car was waiting at the other Orlando airport...". (Harris, ¶ 45; Harris Ex. 8 and pgs. 12 and 21 for the quoted references).

GOAA won this factor in the Opposition without much of the best evidence of actual confusion, including Allegiant's testimony estimating confusion on "25% of flights," the abundant confusion on social media and in complaints to GOAA, over 10,000 confusion instances from GOAA's Palitos reports, and the rental car companies identifying 500 to over 600 passengers per year who booked a car at one airport thinking it was the other. For all the reasons listed above, the Court should affirm the TTAB's finding that actual confusion favors GOAA.

### C. Intent: Sanford is, at Best, Willfully Blind to the Harm it Causes (Factor 6).

The intent factor asks whether the "defendant adopted [the] plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *Frehling Enterprises, Inc. v. Int'l Select Group, Inc*., 192 F.3d 1330, 1340 (11th Cir. 1999). "As direct evidence of intent is rarely available, circumstantial evidence is

12

admissible to show the infringer's fraudulent intent where, as here, there is little to distinguish the marks themselves and the prior mark is a long-established one of which the newcomer was aware, doubts about intent are resolved against the newcomer..." *Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.*, No. 81 CIV. 0178, 1982 WL 51044, at *4 (S.D.N.Y. Dec. 9, 1982). Where direct evidence is not available, "'[w]illful blindness is knowledge enough'" and "willful blindness could provide the requisite intent or bad faith." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991) (addressing infringing intent in the context of willful infringement).

Sanford knew of the Orlando International Airport Marks, as its own board member stated that the name change to add "Orlando should be discussed with Orlando airport people." (Harris Ex. 12 at 2, para. 7; SOF 27). Instead, Sanford adopted a nearly identical name without ever consulting GOAA and over its objections. The more important question, however, is what did Sanford do to investigate whether its choice of name was harming customers after it was adopted? The answer: While Sanford pays lip service to wanting "to provide the best customer experience they can" (Sanford 30(b)(6), p. 24 at 2-6), it has done nothing to prevent passengers from ending up at the wrong airport.

When GOAA informed Sanford of its concerns about confusion with Sanford adding Orlando to its airport name and proposed a joint survey to see if

its name change would cause confusion, Sanford did not agree to conduct a
survey, nor did it propose any other solution. Sanford argues this was a survey to
be conducted only by GOAA, but GOAA proposed to "survey Packagers and
Travelers who have utilized the Sanford airport to determine the extent of
confusion." (van den Berg Memo, Harris Ex. 13, p. 8 at ¶ 2). Of course, GOAA
cannot survey Sanford's customers without Sanford's help, which is why GOAA
proposed a joint survey to Sanford. (Harris, ¶ 51; Harris Ex. 14 at ¶ 2; Sanford
30(b)(6), p. 30 at 12 – p. 33 at 9). Although Sanford could also have implemented a
program to track confusion, Sanford has never done so like GOAA has with its
Palitos reports. (Sanford 30(b)(6), p. 34 at 13 – p. 38 at 5).

When the USPTO issued a 60-page order finding that Sanford's marks are
likely to confuse the public (Ex. C, p. 60), Sanford did nothing to investigate
whether it was confusing customers. (Sanford 30(b)(6), p. 71 at 2-21). Sanford
learned Allegiant Airlines, Sanford's largest carrier, provided an "estimate of 25%
of flights we experience 1 or more passengers displaced due to this [confusion]
mistake" (Ex. H, p. 1), Sanford, again, did nothing to investigate or even ask
Allegiant to investigate this daily to near daily confusion. (Sanford 30(b)(6), p. 88
at 12 – p. 90 at 9).

Even in this litigation, Sanford's corporate representative testified that all
Sanford did to search for confusion evidence was to ask the "terminal ops"

14

managers for Sanford's information desk – but not the actual employees working the desk or the outside vendor who managed the information desk before the last year – whether they tracked instances of confusion. (Sanford 30(b)(6), p. 73 at 9 – p. 80 at 21). When terminal ops reported that "there was no record of anything" on confusion because "[t]hey don't keep records," Sanford made no further attempt to search for confusion evidence.[5] (Sanford 30(b)(6), p. 73 at 9 – p. 74 at 6). Of course, you cannot find something you have not sought. GOAA also served Rule 26 Disclosures on Sanford listing over 50 confused customers or potential customers and many other confusion witnesses from GOAA's employees and contractors. (Ex. R). Sanford chose not to depose even one of them, and, again, did little to nothing to investigate confusion even in this litigation.

GOAA's Chief Development Officer, Vicki Jaramillo, also contacted Allegiant to ask what steps Allegiant could take to reduce confusion. (Harris, ¶ 41). In response, Allegiant said it would have to check with Sanford. (Id.). Allegiant is crucial for limiting confusion because it is the only scheduled service carrier in common between Orlando and Sanford, and Allegiant flights can only

---

[5] On the evening of the last day of discovery, Sanford submitted a supplemental interrogatory response contradicting its representative and explaining that Sanford also conducted at least some confusion searches of web inquiries and Sanford's social media. *See* Ex. T at 4-6. With Sanford's overly narrow definition of what constitutes confusion evidence, whatever searches it conducted are still insufficient. (Id.).

be booked on Allegiant's website, not through third-party sites. (Sanford 30(b)(6),
p. 114 at 18 – p. 115 at 2). Allegiant's flight booking page is, therefore, ground zero
for flight booking confusion between Orlando and Sanford.

GOAA asked Sanford's corporate representative if Sanford would join in
asking Allegiant to add a statement to its booking page for "Orlando" flight
searches to reduce confusion.[6] (Sanford 30(b)(6), p. 115 at 22 – p. 116 at 11). Getting
Sanford on board is important because Allegiant would only be willing to add this
statement if Sanford agreed. (Sanford 30(b)(6), p. 116 at 18-21). The statement
GOAA proposes is the following: "There are two airports with Orlando as the first
word in the airport name. Make sure you know which airport you are booking."
(Sanford 30(b)(6), p. 119 at 3-5). Although Sanford agreed this statement does not
favor either airport, Sanford still refuses to join in asking Allegiant to do this
because it would be "absurd" and "might change their mind about which airport
they book." (Sanford 30(b)(6), p. 119 at 10 – p. 124 at 5). But that is the whole point.
When consumers are confused between Orlando and Sanford, a statement like this
could save consumers from being on one of the "25% of flights" where someone is

---

[6] Sanford's counsel objected to this line of questioning as settlement privileged and
instructed its witness not to answer a question on it. (Sanford 30(b)(6)., p. 126 at 3 – p. 128
at 7). The entire line of questioning was "not asking you about what happened in the
settlement discussions" (Id. p. 118 at 8-9) and was instead asking about the business
inquiry from and any response from Sanford to that business inquiry, thus taking it
outside the scope of settlement privilege.

confused. (Ex. H). That Sanford will not join in asking for even this simple, basic step to reduce confusion speaks volumes about its lack of concern about consumer confusion and the danger of letting it continue to confuse by using Orlando in its airport name.

The reason Sanford has studiously avoided investigating confusion and is unwilling to engage in even the most basic steps to reduce it became clear when its representative was asked if it would be a problem if 100 percent of its customers were confused:

> Q. 100 percent of them think they booked Orlando, and they mistakenly booked Sanford because they were confused by Orlando and the airport names --
> A. Sure.
> Q. -- if it is 100 percent, that's too many. That would be a problem, right?
> A. Well, if -- I don't know that I would call that a problem. <u>We'd be happy</u>…

(Sanford 30(b)(6), p. 84 at 9-16) (emph. added). This was not merely a flippant comment or an attempt at humor. When pressed on specific instances of harm to consumers from confusion, Sanford would not agree that someone who had "to take an Uber from Sanford to Orlando at a cost of $75" to pick up a rental car they mistakenly booked at Orlando because of name confusion is a problem for the consumer. (Sanford 30(b)(6), p. 27 at 11-22). Sanford also "can't agree [it's] a bad thing" if "someone books a flight at the Sanford Airport under the mistaken impression that it was the Orlando Airport and they show up at Orlando for their

flight, and by the time they discover they're at the wrong airport, they have missed their flight." (Sanford 30(b)(6), p. 28 at 23 – p. 29 at 16)(brackets added). This testimony shows Sanford's callous disregard for the harm it is causing consumers, but, as Sanford's corporate representative said, if 100 percent of their consumers were confused, Sanford would "be happy." (Sanford 30(b)(6), p. 84 at 16). Sanford is willfully blind to the confusion and harm it is causing, and this establishes its intent to infringe.

### D. The Orlando International Airport Marks Are Strong (Factor 1).

The first factor focuses on the strength of the plaintiff's mark. "Descriptive marks nonetheless may become distinctive enough to enjoy trademark protection if they acquire 'secondary meaning'…. Secondary meaning develops when the consuming public primarily associates a name with the producer, as opposed to the product." *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1282 (11th Cir. 2020) (internal citations omitted).  Descriptive marks have often acquired secondary meaning to become commercially strong marks.  *See e.g.*, *Duncan McIntosh Co. Inc. v. Newport Dunes Marina LLC*, 324 F. Supp. 2d 1078 (C.D. Cal. 2004), aff'd, 120 Fed. Appx. 119 (9th Cir. 2005) ("Newport Boat Show" is an enforceable mark for boat shows in Newport Beach, CA); *City & Cnty. of San Francisco v. City of Oakland,* No. 24-CV-02311-TSH, 2024 WL 4775737, at *6 (N.D. Cal. Nov. 12, 2024) (granting preliminary injunction barring Oakland's use of "San

Francisco Bay Oakland International Airport" in part because "although San Francisco's [San Franciso International Airport] Mark is descriptive, it is commercially strong" for airport services in the San Francisco area) (brackets added).

The TTAB found the Orlando International Airport mark "is commercially strong, and falls on the higher end of the commercial strength spectrum from very strong to very weak."  (TTAB Order at 33)(emph. added). GOAA's evidence of commercial strength has only become stronger since that finding.  The Orlando International Airport Marks have significant commercial strength, with first use as a common law mark dating back nearly 50 years. (Harris, ¶ 4; SOF 2). Over 35 years ago, GOAA was granted registration for its now incontestable Orlando International Airport Design Mark.  (Harris, ¶ 7; Harris Ex. 1).  The United States Patent and Trademark Office acknowledged, in 1989, that the mark had become distinctive as to the words Orlando International Airport. (Harris Ex. 1 acknowledging "SEC. 2(F)[7] AS TO THE WORDS 'ORLANDO INTERNATIONAL AIRPORT'"; Harris, ¶ 20 and file history at Harris Ex. 4, p. 32).

---

[7] *See Gulf Coast Commercial Corp. v. Gordon River Hotel Assoc.*, 508 F. Supp. 2d 1157, 1163 (M.D. Fla. 2007) ("Marks that are merely descriptive or primarily geographically descriptive under 15 U.S.C. § 1052(e) ("Section 2(e)"), such as The Inn on Fifth mark, may be registered if the applicant shows that the mark has acquired secondary meaning under 15 U.S.C. § 1052(e)(1)(f) ('Section 2(f)')).

GOAA promotes its Orlando International Airport Marks throughout the United States and the world in trade shows, and cultural and sporting events, through social media and many other forms of advertising, and has amassed <u>over 60 awards in the last ten years</u> and widespread recognition for its airport services. (Harris, ¶¶ 17 and 26; SOF 12). In the 20 years from GOAA's adoption of the Orlando International Airport Mark in 1976 (SOF 2) to Sanford's name change in 1996, the Orlando International Airport served hundreds of millions of passengers and spent tens of millions of dollars promoting the Orlando International Airport Marks. (Harris, ¶¶ 18-19). GOAA has also spent <u>well over $10 million dollars in the last decade</u> promoting the Orlando International Airport Marks. (Harris, ¶ 25). The annual budgets for the Orlando International Airport for the last ten years have ranged <u>between $400 million and $800 million dollars</u>. (Harris, ¶ 24). "Between September 1, 2021 and March 24, 2025, there have been <u>more than thirty-four million visitors</u> to Orlando International Airport's websites." (Harris, ¶ 13).

Sarah Butler, a highly respected survey expert, conducted a strength of mark survey for GOAA that found the "<u>overwhelming majority of consumers believed that Orlando International Airport is the name or location of one airport</u>," further underscoring the strength of the Orlando International Airport Marks. (Butler Survey, Ex. S, ¶ 29) (emph. added). Sanford criticized GOAA's survey but has no survey of its own to counter this evidence.

20

GOAA has also shut down the only other airport infringing on the Orlando International Airport Marks when resolving its dispute with the Melbourne Airport Authority ("Melbourne"). (Harris, ¶ 37; Harris Ex. 5). As part of the settlement, Melbourne "acknowledges GOAA's rights [..] and the strength of the unitary mark 'Orlando International Airport' as indicating the high-quality airport services provided by GOAA" and "consents to and accepts the license granted by GOAA" to use its mark. (Id., 4th whereas clause and Section 2(A)) (emph. added). After GOAA eliminated MLB as an infringer, there are no airports other than Sanford using marks that are the same as or similar to the Orlando International Airport Marks for airport services. GOAA has also successfully enforced its Orlando International Airport Mark against many other infringers. (Harris, ¶ 39; Harris Ex. 6). The strength factor favors GOAA, and, when combined with the other factors, all seven factors favor GOAA and provide a clear basis for the Court to affirm the TTAB's likelihood of confusion finding.

## IV. The Court Should Grant a Permanent Injunction Against Infringement.

The Court has broad discretion to fashion injunctive relief, and the case for enjoining Sanford's infringement to protect the public is clear.  A plaintiff seeking a permanent injunction must show:

> (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is justified; and (4) the public interest would not be disserved by a permanent injunction.

*Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (internal citation omitted).  All four factors favor GOAA.  Here, Sanford has "exacerbated consumer confusion in the relevant marketplace. This type of harm is certainly hard to quantify and thus is irreparable."  *Edge Sys. LLC v. Aguila*, 186 F. Supp. 3d 1330, 1362 (S.D. Fla. 2016), aff'd, 708 Fed. Appx. 998 (Fed. Cir. 2017)

The many thousands of instances of daily to near daily confusion above also show GOAA has suffered irreparable injury.  Remedies at law are insufficient to stop the confusion Sanford is causing where there is no indication it will do anything to stop future infringement, and, in fact, will continue to "be happy" by benefitting from consumer confusion caused by that infringement *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996)  (noting even in cases involving acquiescence, "the public interest in preventing confusion around the marketplace is paramount to any inequity caused the [junior user]" by granting an injunction).  The balance of hardships favors GOAA because Sanford never needed to adopt its infringing marks over GOAA's objections, and it would have incurred all the same advertising expenses with a non-infringing mark. (Sanford 30(b)(6), p. 205 at 12 – p. 207 at 23).  The public interest in being free of the confusion Sanford is causing is also clear.

22

Sanford will argue that laches and acquiescence bar injunctive relief, but "[w]hen inevitable confusion is shown, [..] the senior user is no longer estopped." *SunAmerica*, 77 F.3d at 1335 (affirming grant of injunction despite plaintiff's acquiescence to defendant's mark). Where inevitable confusion is shown, there is no balancing test, and the remedy is an injunction. (Id.). Sanford itself suggests this is the appropriate remedy when trying to distinguish the *Pitt* case. (Doc. 35 at 16-17). This remedy also follows the Eleventh Circuit's approach: "if the likelihood of confusion is inevitable, or so strong as to outweigh the effect of the plaintiff's delay in bringing a suit, <u>a court may in its discretion grant injunctive relief, even in cases where a suit for damages is appropriately barred</u>." *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1207 (11th Cir. 1997)(emph. added); *see also Pinnacle Advertising and Marketing Group, Inc. v. Pinnacle Advertising and Marketing Group, LLC*, 7 F.4th 989, 1011, 110 Fed. R. Serv. 3d 657 (11th Cir. 2021)(same). GOAA's primary objective in its dispute with Sanford has always been to protect the public from the confusion Sanford is causing (Harris, ¶ 55). Although GOAA maintains it is entitled to damages, it would gladly accept a decision barring its damages claim if the Court grants an injunction prohibiting confusion to protect the public. If the Court does so, justice will be served, and there will be no need for a trial.

23

## CONCLUSION

GOAA's Orlando International Airport Marks were used for decades before Sanford's name change.  The marks are commercially strong.  Sanford uses nearly identical marks that incorporate GOAA's entire Orlando International Airport Word Mark for the same services to reach the same consumers through the same channels of trade and advertising. Sanford has been willfully blind to the confusion it is causing and refuses to take even the most basic steps to help consumers avoid confusion, thus establishing its intent to infringe. The over ten thousand instances of confusion collected by GOAA's information desk, the hundreds of mistakenly booked cars per year, the 25 percent of flights on which Allegiant estimates confusion, the extensive social media evidence of confusion, and the confusion testimony from every witness who was deposed show that actual confusion is not just happening – it is happening on a daily to near daily basis.  Where every confusion factor favors GOAA, this Court should affirm the TTAB's finding of likelihood of confusion.  Where GOAA has strong trademark rights and daily to near daily confusion is inevitable, the Court should enjoin Sanford's use the Orlando Sanford International Marks to protect the public.

Wherefore, GOAA respectfully requests that the Court affirm the Trademark Trial and Appeal Board's finding of likelihood of confusion and strong trademark rights, find that Sanford has infringed GOAA's trademark rights, and

enter a permanent injunction barring Sanford's use of the Orlando Sanford International Airport Marks or any other marks colorably similar to the Orlando International Airport Marks.

Dated: April 1, 2025

Respectfully submitted,

*/s/ Stephen H. Luther*
Stephen H. Luther, Esq.
Florida Bar No. 528846
Luther Law PLLC
4767 New Broad Street, # 1029
Orlando, Florida 32814
Phone (407) 501-7049
sluther@lutherlawgroup.com

**Counsel for Defendant**
**The Greater Orlando Aviation**
**Authority**