**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SANFORD AIRPORT AUTHORITY,**

**Plaintiff/Counterclaim Defendant,** **CASE NO.: 6:23-cv-1563-PGB-DCI**

**v.**

**GREATER ORLANDO AVIATION AUTHORITY,**

**Defendant/Counterclaim Plaintiff.**
**_______________________________________/**

# JOINT FINAL PRETRIAL STATEMENT

Plaintiff/Counterclaim Defendant Sanford Airport Authority ("SAA" or "Plaintiff") and Defendant/ Counterclaim Plaintiff Greater Orlando Aviation Authority ("Greater Orlando", "GOAA" or "Defendant")[1] submit this Joint Final Pretrial Statement pursuant to Local Rule 3.06(b) and the Court's 3rd Amended Case Management and Scheduling Order (Doc. 56, "CMSO").

[1] Greater Orlando believes for the jury's benefit in order to avoid confusion with acronyms, it should be referred to by its name or a portion of its name. SAA disagrees and will file a motion to address this issue as a central issue in this dispute is use of the word "Orlando" in connection with international airports. Unable to reach a resolution for the pretrial, Greater Orlando will be referred to as GOAA in this pretrial statement at the insistence of SAA but does not agree it should be referred to as such before the jury.

1. **<u>Basis for The Court's Jurisdiction</u>**

This Court has jurisdiction over this case. Subject matter jurisdiction is established under 15 U.S.C. § 1071(b), which allows a party to challenge a final decision of the Trademark Trial and Appeal Board ("TTAB") in a civil action in federal district court. Doc. 1. ¶6. This Court also has subject matter jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338 as the case involves federal questions under the Lanham Act. Personal jurisdiction is proper over the Defendant, as it has purposefully availed itself of the privileges and benefits of doing business in the Middle District of Florida. Doc. 1. ¶7. Venue is proper under 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. § 1071(b)(4) because the Defendant resides in this judicial district. *Id.*, at ¶7.

2. **<u>Concise Statement of the Action</u>**

This action involves two issues: (1) SAA's appeal of the TTAB's decision not to register SAA's trademarks for "Orlando Sanford International Airport" (both the words and a stylized version, collectively the "SAA Marks") seeking to determine if the denial was proper and (2) Whether the SAA Marks infringe on GOAA's alleged trademarks for "Orlando International Airport" (both the words and a stylized version, collectively the "GOAA Marks."). SAA's appeal is an issue

for the Court, and GOAA contends the infringement issues are for the jury. (SAA contends both issues are for the Court).

3. **<u>Concise Statement of Each Party's Position</u>**

**a. Plaintiff's Statement of the Case**

SAA's appeal under 15 U.S.C. § 1071(b), seeks de novo review of a final decision by the TTAB (Doc. 1-9). SAA sought registration of its word mark Orlando Sanford International Airport (which it has used since 1996), and a logo (which it has used since 2012). After the PTO determined those applications were allowable, the TTAB eventually sustained GOAA's oppositions seeking to preclude their registrations. SAA seeks review and reversal of the TTAB's decision in consolidated Opposition Proceeding No. 91234602, which sustained GOAA's opposition to the registration of SAA's trademarks on the grounds of likelihood of confusion with GOAA's registered mark, ("GOAA's Design Mark") and its alleged common law rights in both the alleged wordmark Orlando International Airport and its composite word-and-design mark shown above. SAA also seeks a declaration of non-infringement.

SAA further seeks a declaration that the phrase "Orlando international airport" (separate and apart from GOAA's stylized design) in connection with airport services is generic for airport services in the Orlando area and thus unable to serve as a trademark.

GOAA has asserted 3 affirmative defenses. GOAA's first defense relates to cancellation of a trademark, but SAA has not pursued any such cancellation. GOAA has no registration for the generic phrase Orlando international airport, and this generic phrase does not serve as a trademark for an international airport in the Orlando area. GOAA's second defense argues estoppel, but SAA's mark does not use a generic phrase, as the prefatory phrase "Orlando Sanford" in SAA's marks is not generic. GOAA's third defense seeking to impose some pre-litigation requirement does not appear applicable against SAA's affirmative claims.

GOAA has counterclaimed for federal trademark infringement under the Lanham Act and infringement under Florida common law for SAA's use of the SAA Marks and is seeking damages and injunctive relief. In response, SAA seeks judgment in its favor on its affirmative defenses asserting that each of GOAA's claims are barred individually and collectively by the statute of limitations, laches, and/or acquiescence. Doc. 19 at 7. GOAA has admittedly known about is

supposed claims since 1996 and acquiesced to SAA's branding before the turn of the century. As such, GOAA's claims are barred. GOAA has also not plead or proved actual damages.

GOAA attempts to challenge this 1996 date, but its challenge is without merit. The 2 airports are 31 miles from one another and have advertised in the same newspapers (often times on the same page) using their current respective names since 1996. GOAA also attempts to argue that SAA's airport usage is somehow different than it used to be, but that is also not accurate. SAA began scheduled operations at least as early as 2004 (with Allegiant beginning operations at SAA in 2004 and Pan Am and others doing so previously).

GOAA's trademark infringement claim based on its asserted common law rights in the phrase "Orlando international airport" fails because the phrase is generic for airport services and is thus not protectible. GOAA's position that SAA is barred from raising a claim of genericness in this action is a misinterpretation of applicable law. Under 15 U.S.C. § 1071(b), a party who appeals a decision from the TTAB is entitled to pursue new claims in the district court. This statutory provision, along with related case law, supports SAA's position that it may introduce new claims, including those related to genericness, in this action. SAA

was not presented with defending against claims of infringement in front of the TTAB, while here it is. This action was brought under 15 U.S.C. § 1071(b) which the courts acknowledge is both an appeal and a new action. As such, SAA can bring claims not addressed on the merits by the TTAB. *See, e.g.*, *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 156 (4th Cir. 2014) (holding "the district court properly reviewed Swatch's dilution-by-blurring claim entirely de novo because the TTAB did not address it on the merits"); *accord Pound Law LLC v. Vidal*, No. 6:23-CV-61, 2023 WL 11263253, at *1 (M.D. Fla. Apr. 12, 2023); 15 U.S.C. § 1071(b)(1). Genericness is a question of fact for the fact-finder.

SAA rebranded its airport as the Orlando Sanford Airport in 1995. In 1996, SAA rebranded its airport as the Orlando Sanford International Airport and has operated under that name ever since. Defendant has known about this name since the very beginning in 1995 and took no action to stop SAA from using it. Rather, the two airports discussed at length Defendant's concerns in the late 1990s, with each of them forming a committee to work jointly towards any issues that may arise. But the market demonstrated peaceful coexistence with the airport names and Defendant took no action against SAA. SAA continued to grow under its

brand, and now almost 30 years later, both Orlando Sanford International Airport and Orlando International Airport have flourished under their respective names.

SAA sought trademark registrations for 2 of its marks. After the United States Patent and Trademark Office (the "USPTO") determined that SAA's trademark applications appeared registrable, Defendant filed opposition proceedings with the Trademark office. The TTAB resolved those proceedings without properly taking into account the peaceful coexistence of the 2 airports over the past decades. SAA appealed that decision by filing this lawsuit. In response to that appeal, Defendant filed a counterclaim for trademark infringement and unfair competition, notwithstanding Defendant's acquiescence to SAA's brand since 1995. SAA seeks judgment in its favor that Defendant is estopped from pursuing any infringement or unfair competition claim against SAA and has instead acquiesced to the Orlando Sanford International Airport brand.

GOAA has never sued SAA for trademark infringement, other than its counterclaim here. That counterclaim was not filed until October 27, 2023 (Doc. 13), 28 years after SAA became known as Orlando Sanford International Airport. In other words, GOAA slept on its asserted rights, and through that 28-year silence, SAA relied on this silence and built its reputation under this brand. It is

simply too late now for GOAA to walk back its decision not to assert its rights or a claim after nearly 30 years of coexistence. It is also clear that the airports worked out an agreement and understanding to help grow the Orlando area together. GOAA's 30-year delay in asserting its rights only seeks to undo whatever deal was made between the airports decades ago. GOAA's claims are barred by the statute of limitations, laches, and/or acquiescence.

GOAA's statement of the case (*infra*) incorrectly presumes that the TTAB's decision and findings particularly on the likelihood of confusion factors and the weight of the evidence are final and binding on this Court. However, 15 U.S.C. § 1071(b) provides for review of TTAB decisions of the sort SAA seeks here and this Court must review the facts de novo.

GOAA also misstates the acquiescence standard, focusing only whether it "actively represented it would not assert a right or claim." *See infra*. Putting aside that GOAA did so actively represent it would not pursue such a claim, the law is clear that an explicit promise not to sue is not required. *See Univ. of Ala. Bd. Of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1282 (11th Cir. 2012) (*see also* Doc. 35 at 10). All that is required is "conduct on the [trademark owner's] part that amounted to an assurance to the [alleged infringer], *express or implied*, that [trademark owner] would not assert his trademark rights against the [alleged

infringer]." *Id*. (emphasis added). The 30-years of peaceful coexistence demonstrates GOAA's affirmative conduct of acquiescence.

**b. Defendant's Statement of the Case**

After more than five years of litigation, the TTAB ruled decisively in GOAA's favor in a 60-page Order that the SAA Marks are likely to be confused with the GOAA Marks. The TTAB ruled a majority of the likelihood of confusion factors are undisputedly in GOAA's favor, including that SAA offers the same services (factor 3) to the same consumers through the same channels of trade (factor 4) through the same advertising (factor 5) using marks that incorporate the Orlando International Airport mark in its entirety (factor 2). For factor number 1 (strength of the mark), where GOAA has undisputedly served more than half a billion customers under its Orlando International Airport marks for nearly fifty years, the TTAB also correctly found that the Orlando International Airport mark "is commercially strong, and falls on the higher end of the commercial strength spectrum from very strong to very weak."

The correctness of the TTAB's decision is all the more apparent from the additional discovery that has come to light during discovery in this litigation. In particular, the Court now has before it far more evidence of actual confusion

(factor 7) than the evidence that convinced the TTAB to find that this factor favors GOAA, including more than 10,000 instances of confusion recorded in the GOAA's Palitos reports, over 600 instances of confusion between the Orlando International Airport and Orlando Sanford International Airport in just the last year, and many other instances of confusion that have occurred since the TTAB decision. Sanford correctly notes that factual findings by the TTAB on which new evidence is presented are reviewed *de novo*. Factual findings from the TTAB on which no new evidence is presented are reviewed under the substantial evidence standard.

For intent (factor 6), the evidence of what is, at best for SAA, willful blindness to confusion problems and a cavalier disregard for the harm it is causing consumers also clearly establish the intent factor. Despite clear evidence of actual confusion as found by the TTAB, SAA has refused to take any steps beyond the minimum required in discovery to investigate infringement and is unwilling to take even the most basic steps to resolve confusion with Allegiant.

While seeking the right to register its nearly identical marks, SAA contends the Orlando International Airport marks are generic, but it has never explained how it has the right to advance that argument now when it failed to raise

genericness as a compulsory counterclaim in the Consolidated Opposition. (Doc. 46 at 15-16). Even if genericness were properly before the Court (which it is not), SAA has failed to identify any genus of services that constitute Orlando International Airport services apart from airport services generally, has not identified any witnesses who will testify that the "primary significance of the registered mark to the relevant public" is a generic one and has not identified any documents in which consumers or competitors perceive it as such. SAA's genericness case is, instead, based on dictionary definitions of the individual words in the mark that improperly dissect the mark and such definitions could provide nothing more than a starting point to evaluate genericness.

For acquiescence, SAA concedes the first element of the defense requires that GOAA "actively represented it would not assert a right or claim." SAA argues above that it "appears clear that the airports worked out an agreement" where GOAA consented to SAA's use of the Orlando Sanford International Airport Marks but has failed to identify any witnesses who will testify GOAA ever actively represented to SAA that GOAA would not object to such marks and points only to documents with vague statements about a desire to work together, each of

which expressly dispute SAA's right to use the marks. This evidence falls far short of establishing that GOAA "actively represented" it would not assert a claim.

For laches, the delay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement and the clock does not start running until the likelihood of confusion looms large. From the Opposition proceeding through to the present, SAA has consistently argued exactly the opposite: that "there is not a likelihood of consumer confusion" now, and there never has been:

> Despite nearly 30 years of the marks' coexistence in the marketplace, GOAA can point to no meaningful instances of actual confusion. Such extended coexistence without confusion is strong evidence that confusion is unlikely.

Instead of explaining when the likelihood of confusion loomed large, SAA argues it is "absurd" to ask it to specify when this occurred. It is not, and other defendants have admitted confusion while hoping to win on laches. Where even SAA cannot say when the likelihood of confusion loomed large, there is no basis on which the Court could find laches. Moreover, the mark SAA initially stated its intent to change to was Orlando Sanford Airport without "international," and GOAA was not aware of the addition of "international" to its name until many years later. At the time of the proposed name change, SAA was only pursuing charter/package

tour business that constituted a tiny percentage of GOAA's business and charter tour operators were much less likely to be confused. It was only much later that SAA progressively encroached into GOAA's main line of business with scheduled service carriers.

Further, even if the Court could properly find laches, acquiescence or estoppel (which it should not), when inevitable confusion is shown, the senior user is no longer estopped. Actual confusion is inevitable, and the Court should enter an injunction prohibiting SAA's use of the SAA Marks to protect the public from confusion that is happening on a daily to near daily basis. In addition to establishing the necessary basis for injunctive relief, GOAA also seeks damages for SAA's infringement based on the revenue lost by GOAA and unfairly gained by SAA, for enhanced damages if SAA's infringement was willful, and for any other damages allowable under the Lanham Act. GOAA also seeks an award of attorneys' fees under the exceptional case standard set forth in the Lanham Act.

4. **<u>List of Exhibits with Objections</u>**

Plaintiff's Exhibit List, with objections, is attached as **Exhibit A**.

Defendant's Exhibit List, with objections, is attached as **Exhibit B**.

Joint Exhibit List is attached as **Exhibit C**.

5. **<u>List of Witnesses</u>**

Plaintiff's Witness List is attached as **Exhibit D**.

Defendant's Witness List is attached as **Exhibit E**.

6. **<u>List of Expert Witnesses</u>**

**a. Plaintiff's Expert Witnesses**

Brian M. Sowers is a survey expert. Mr. Sowers will testify relating to his review and evaluation of the survey conducted by Sarah D. Butler. Specifically, Mr. Sowers will testify as to the flaws of Ms. Butler's survey. Mr. Sowers' testimony will only be necessary if the Court denies SAA's motion to exclude Ms. Butler's testimony. *See* Doc. 42.

**b. Defendant's Expert Witnesses**

Sarah Butler, GOAA's trademark survey expert, will testify that her survey shows that the "overwhelming majority of consumers believed that Orlando International Airport is the name or location of one airport" and that this evidence demonstrates the strength of the GOAA Marks.

7. **<u>Claimed Damages</u>**

a. Plaintiff's Statement on Damages

SAA will be seeking its attorneys' fees and costs and any additional remedies that are just and proper allowable under the law. SAA disputes that GOAA is entitled to any damages and disputes any amount of damages sought by GOAA. SAA has briefed this issue through its Motion to Strike Jury Demand (Doc. 57) and forthcoming Motion in Limine. GOAA has not proffered any documents or testimony to support its speculative claim for damages. While unlikely that GOAA will prevail on its time-barred claims, even if it did, GOAA is not entitled to any enhanced damages because this case is not an exceptional case as defined by the Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). SAA reserves the right, as appropriate, to object to any supplement of damages by GOAA.

b. Defendant's Damages

GOAA seeks damages for trademark infringement via GOAA's lost profits, a disgorgement of SAA's profits, any other damages that are not duplicative of the above, enhanced damages for willful infringement, an award of attorneys' fees and costs of suit, and all other remedies that may be available. More specifically, GOAA's lost profits damages include, at a minimum, the passenger facility charges that GOAA should have received for each passenger lost as a result of SAA's

conduct. The passengers lost to SAA include at least the number of passengers identified in the Palitos reports for a period commencing on October 27, 2019 (i.e., four years before the filing of GOAA's Counterclaim) through the present. The jury may also consider GOAA's evidence of infringement without the annual Palitos report data and can evaluate that evidence in light of the fact that many confused consumers will not contact the parties to complain to determine an appropriate amount of lost profits damages or disgorgement of SAA's profits as damages.

8. **List of Depositions to be Offered at Trial**

Plaintiff will not be offering any depositions at trial.

Defendant's list of depositions to be offered at trial, as well as objections, counter-designations, objections to counter-designations, and rebuttal designations, is attached hereto as **Exhibit F**.

9. **Concise Statements of Facts Which Are Admitted**

The parties agree that the following facts are uncontested, but, reserve objections pursuant to Federal Rules of Evidence 402 and 403 as to the following facts:

(1) SAA operates the Orlando Sanford International Airport.

(2) GOAA operates the Orlando International Airport.

(3) GOAA has operated the Orlando International Airport under that name since 1976.

(4) GOAA is not the City of Orlando.

(5) Both Airports are in the Orlando-Kissimmee-Sanford metropolitan statistical area.

(6) The Orlando Sanford International Airport is 25-miles from downtown Orlando.

(7) The airport SAA operates has been in operation since 1942 and was renamed in 1995 to the Orlando Sanford Airport.

(8) On July 26, 2016, Sanford filed U.S. Trademark Application No. 87/115,958 to register the word mark Orlando Sanford International Airport.

(9) On July 26, 2016, Sanford also filed U.S. Trademark Application No. 87/115,959 to register the following design mark:

OrlandoSanford
INTERNATIONAL AIRPORT
We Are SFB: Simpler. Faster. Better.

(10) SAA is the owner of U.S. Trademark Registration No. 5,175,377 for the word mark "WE ARE SFB: SIMPLER. FASTER. BETTER.

(11) GOAA is the owner of incontestable U.S. Service Mark Registration No. 1,565,079 for the following Orlando International Airport Design Mark as used on "airport services" in International Class 39, which registered November 7, 1989:

ORLANDO
INTERNATIONAL
AIRPORT

(12) GOAA has been offering services under the Orlando International Airport Design mark since at least as early as September of 1981.

(13) On April 4, 1995, SAA's governing body voted to change the name of its airport from Central Florida Regional Airport to Orlando Sanford Airport.

(14) GOAA has been aware of SAA's s stated intention to use the word Orlando in its airport name since 1995.

(15) GOAA objected to SAA's new proposed airport name in 1995, and believed there was a "strong" likelihood of confusion.

(16) The Orlando International Airport has received more than 50 million passengers per year in recent years.

(17) GOAA promotes its Orlando International Airport Marks on its Orlandoairports.com website and, more recently, on its flymco.com website.

(18) SAA promotes it Orlando Sanford International Airport Marks on its Flysfb.com website.

(19) GOAA promotes its Orlando International Airport Marks on social media including Facebook, Twitter, Instagram and other platforms.

(20) SAA promotes its Orlando Sanford International Airport Marks on social media including Facebook, Twitter, and Instagram.

(21) GOAA provides airport services to the air travelling public, including passenger air travel into and out of the greater Orlando region, as well as to businesses such as airlines, rental car companies, and other vendors who provide goods or services to the air travelling public.

(22) SAA provides airport services to the air travelling public, including passenger air travel into and out of the greater Orlando region, as well as to businesses such as airlines, rental car companies, and other vendors who provide goods or services to the air travelling public.

(23) The Orlando Sanford International Airport serves customers who are interested in flying into or out of the Central Florida area.

(24) The Orlando International Airport serves customers who are interested in flying into or out of the Central Florida area.

(25) The Orlando International Airport is located approximately 31 miles from the Orlando Sanford International Airport.

**9.1 The following are statements SAA contends are “Undisputed Facts.” GOAA does not agree and contends the statements are disputed as presented, irrelevant or inappropriate for a Pretrial Statement.**

(26) Sometime in 1996, SAA added the word “International” and has been known since 1996 as the Orlando Sanford International Airport

(27) On June 14, 2017, the U.S. Patent and Trademark Office stated that the wordmark ORLANDO SANFORD INTERNATIONAL AIRPORT “appears to be entitled to registration.”

(28) On December 28, 2016, the U.S. Patent and Trademark Office stated that the design mark: “appears to be entitled to registration.”

(29) The FAA has recognized SAA’s airport as the Orlando Sanford International Airport since at least 2004.

(30) In 2024, MCO was the seventh busiest airport in the United States and the busiest in Florida based on passenger enplanement data from the Federal Aviation Administration (“FAA”).

(31) The Orlando International Airport serviced over 49 million passengers in 2019 alone.

(32) In the years 2013-present, MCO has serviced at least 500,000,000 travelers.

(33) At the May 17, 1995 meeting of the GOAA Board, the GOAA Board reported "that an airport 30 miles north of this airport is using our name and [Board Member Mr. Pugh] believes that it is misleading and confusing. Action needs to be taken to address this issue." The GOAA Board voted to have its legal counsel address this issue.

(34) On or about June 14, 1995, GOAA received an opinion letter from its legal counsel, Mr. van den Berg, concerning SAA's airport's name, which addressed the issue of a possible likelihood of confusion between the airport names. The opinion letter recommended GOAA share its concerns with SAA, and if the parties could not find an agreeable solution, then GOAA should survey relevant consumers to determine if there was a likelihood of confusion. The opinion letter stated should the survey show confusion, GOAA should consider whether to file suit against SAA. The opinion letter stated:

> We respectfully submit the following recommendations.

> 1) That GOAA discuss its concerns fully and frankly with the Sanford Airport Authority. It is encouraging that, in March at least, the Sanford Airport Authority Board wished to engage in discussions with GOAA before the word "Orlando" was included in the name of the Sanford airport. Such discussions might produce a mutually agreeable resolution.
>
> 2) If the efforts just described do not succeed, that GOAA initiate a strategy to survey Packagers and Travelers who have utilized the Sanford airport to determine the extent of confusion which attended their decisions to travel over the Sanford airport. There are accepted techniques for conducting surveys of this kind.
>
> 3) If the survey results show no significant level of confusion among Packagers and Travelers, it would be reasonable for GOAA to defer further action at that time.
>
> 4) If the survey results show a significant level of confusion among either Packagers or Travelers, this information should be shared with the Sanford Airport Authority in a second effort to reach a mutually agreeable resolution. If that cannot be achieved, then GOAA should consider whether to file suit to enjoin continued use by the Sanford Airport Authority of its newly adopted name, and to recover money damages. (If use of the Sanford airport by Packagers has not become significant, that fact might weigh against litigation, even if a high percentage of the Packagers or Travelers who actually used the Sanford airport was confused by the similarity in the names of the two airports.)

(35) The GOAA Board discussed this legal counsel letter at its Board meeting a week later on June 21, 1995. At that meeting, the Board received a presentation entitled "Discussion of Action Plans Responding to Customer Survey." The Executive Director of the Board, Robert Bullock, reported the following:

> Mr. Bullock stated that he had an opportunity to review the analysis prepared by Mr. van den Berg. He mentioned several important factors that were considered including the importance Sanford Airport has to aviation and the importance of both airports working together to attract as much new air traffic to the region as possible. He stated that mutual collaboration over an issue such as this will have much more positive results for Central Florida and would be a preferred method for resolving any real problems that may exist.

On Mr. Bullock's recommendation, the GOAA Board authorized GOAA staff to communicate with SAA's leadership about a possible name change and confusion survey. Mr. Bullock reported that he would contact SFB and would report back.

(36) On or about June 29, 1995, GOAA's Executive Director, Robert B. Bullock, met with SAA executives about concerns with SAA's airport name and stated that GOAA objects to SAA using the Orlando Sanford Airport mark.

(37) On June 30, 1995, Mr. Bullock, on behalf of GOAA, sent SAA a letter about the SAA name change, stating that GOAA "believe[s] that there is a strong likelihood of confusion, and therefore, disservice to the visitor with two airports having a similar-type name." The letter continued:

> As our marketplace grows with the recently announced expansion plans by Walt Disney World and Universal, I believe there are opportunities for both airports to grow. Areas of potential mutual interest could include the staffing of Federal agencies to assure that the customer using either airport receives a consistently high quality of service. I also believe that there are potential joint operational considerations that could be addressed ranging from safety and security training to

> recommendations of the Sanford airport as an alternate airport for Orlando International Airport during irregular operations. I also believe that there are some potential joint airport marketing opportunities which could allow the Central Florida area to optimize its airport resources.
>
> I do believe that the issue of the like names of the airports is pivotal, and the current similarity in names unnecessarily complicates our mutual efforts to capitalize on these opportunities.
>
> Thanks again, Steve, for the chance to meet. I would welcome the opportunity to further discuss options which are in our region's best interest.

(38) At the July 5, 1995 GOAA Board workshop, it was reported that GOAA's chairman Robert Hattaway had met with the Executive Director and two members of SAA and that "the meeting dealt with the name change issue and the survey previously mentioned at a board meeting."

(39) GOAA did not undertake a survey to determine if there was a likelihood of confusion in the late 1990s.

(40) After seeking an extension of time to oppose the Orlando Sanford International Airport Design Mark on February 10, 2017, GOAA filed Opposition No. 91234602 with the TTAB directed to the '959 Application on May 17, 2017.

(41) GOAA filed Opposition No. 91235774 with the TTAB directed to the '958 Application on July 26, 2017.

(42) On October 12, 2017, the TTAB consolidated Opposition No. 91234602 and Opposition No. 91235774.

(43) The basis for each opposition proceeding was GOAA's contention that the Orlando Sanford International Airport Marks are likely to be confused with the Orlando International Airport Marks, not trademark infringement.

(44) SAA did not file a counterclaim in the Opposition seeking cancellation of the Orlando International Airport Design Mark registration.

(45) The TTAB sustained GOAA's consolidated opposition, and refused to register SAA's two trademarks on the federal trademark register as follows:

> The opposition to registration of the marks of Application Serial Nos. 87115958 and 87115959 is sustained on the ground of likelihood of confusion under Section 2(d), 15 U.S.C. § 1052(d), and registration to Applicant is refused.

(46) On August 16, 2023, SAA filed this lawsuit to appeal the TTAB's decision refusing SAA's trademark registration.

(47) On October 27, 2023, GOAA filed its counterclaims for trademark infringement and unfair competition in this lawsuit.

(48) GOAA did not bring any lawsuit against SAA in 2016 or any years prior.

(49) In or around March 2019, GOAA filed a lawsuit against Melbourne Airport Authority ("MLB"), including claims for alleged false advertising and trademark infringement based on MLB's airport name Orlando Melbourne International Airport and use of a webpage www.theorlandoairport.com to promote the MLB airport.

(50) When GOAA filed its lawsuit against MLB, GOAA was aware of SAA's use of the mark Orlando Sanford International Airport.

(51) From a customs and immigration perspective, the Orlando International Airport and the Orlando Sanford International Airport are both part of the same port of entry and they use the same pool of officers to cover both airports for customs and immigrations. This has been the case since at least 1995.

(52) SFB is a reliever airport for MCO. MCO is a reliever airport for SFB.

10. **Concise Statement of Each Agreed Principle of Law**

(1) The Court has subject matter jurisdiction over this action.

**15 U.S.C. § 1071(b) Appeal**

(2) Section 1071(b) permits a party "dissatisfied with the decision" of the TTAB to initiate a civil action in a United States District Court. 15 U.S.C. § 1071(b)(1).

**Trademark Infringement**

(3) The agreed jury instructions, attached hereto, are appropriate principles of law on the issue of trademark infringement and defenses thereto.

(4) If GOAA prevails on its trademark infringement claims, GOAA must establish the following four factors to be entitled to injunctive relief:

> (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is justified; and (4) the public interest would not be disserved by a permanent injunction.

(5) The Eleventh Circuit generally evaluates trademark infringement and common law unfair competition together.

**Trademark Infringement Defenses Generally**

(6) Each party has the burden to prove their respective affirmative defenses by a preponderance of the evidence.

**Laches Defense**

(7) The doctrine of laches may be applied to bar Lanham Act claims.

(8) To prevail on its defense of laches, SAA must prove: (1) GOAA delayed in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to SAA.

**Acquiescence Defense**

(9) To prevail on its defense of acquiescence, SAA must prove: (1) GOAA actively represented it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused SAA undue prejudice.

(10) Active consent does not necessarily mean an explicit promise not to sue. It only requires conduct on the trademark owner's part that amounted to an assurance to the alleged infringer express or implied, that the trademark owner would not assert his trademark rights against the alleged infringer.

**Statute of Limitations Defense**

(11) Florida law imposes a 4-year statute of limitations on "any action not specifically provided for in these statutes." Fla. Stat. § 95.11(o). The Lanham Act has no statute of limitations. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986) (". . . because the Lanham Act does not contain a statute of limitations, the period for analogous state law claims is to be used as a

touchstone for laches. The pertinent limitations period for this type of action in Florida is four years."). The parties disagree as to whether Florida's statute of limitations bars all of GOAA's claims.

**Genericness Defense**

(12) SAA, as the party asserting genericness of the phrase Orlando International airport, must prove that the asserted trademark was generic as of the date on which the alleged infringement began.

(13) A generic term is entitled to no trademark protection. *See USPTO v. Booking.com*, 591 U.S. 549, 554 (2020).

(14) "A generic term is one that refers to the genus of which the particular product is a species." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).

11. <u>**Concise Statement of Each Disputed Issue of Fact**</u>

**a. Plaintiff's Statement of Each Disputed Issue of Fact**

(1) In 1996, SAA changed the name of its airport to Orlando Sanford International Airport.

(2) Since this name change in 1996, SAA has continuously operated its airport under the name Orlando Sanford International Airport.

(3) Passenger traffic has grown at SFB from approximately 48,000 passenger/year in 1995 to 2.8 million passenger/year in 2024.

(4) At the November 5, 1997 GOAA Board meeting, it was announced that Mr. Bullock, the Executive Director, was retiring. GOAA's appreciation of Mr. Bullock's service included a formal resolution praising Mr. Bullock *inter alia* "WHEREAS in just over 3 years as Executive Director, Mr. Bullock strengthened the Authority's relationship with the Signatory Airlines, empowered the Authority's staff, improved the Authority's working relationship with the City of Orlando, and nurtured the Authority's connection to the Central Florida community." At this same meeting, GOAA's former legal counsel now Executive Director and Secretary Mr. van den Berg reported concerning the Sanford airport "that the idea of creating an airport liaison initiative has been advanced to facilitate discussion by the airport entities of specific programs or concerns." This liaison, intended to be a third party Metroplan (the Metropolitan planning organization for Orlando, Osceola, and Seminole counties), would serve an advisory capacity. The GOAA Board approved this recommendation.

(5) At GOAA's December 18, 1997 Board meeting, GOAA's Executive Director reported that SAA had approved the engagement of a liaison and had authorized $20,000 in funds. GOAA similarly reported it also had a similar commitment with the proposed liaison. The minutes reflect that a meeting will be schedule the following month and further updates would be provided. GOAA has no further records concerning this liaison.

(6) GOAA never filed a lawsuit for trademark infringement or unfair competition against SAA until it filed its counterclaims in this litigation on October 27, 2023. The only other formal action GOAA took against SAA concerning SAA's name was filing Oppositions with the Trademark Trial and Appeal Board ("TTAB") in 2017, twenty-one (21) years after Sanford renamed its airport.

(7) Allegiant Airlines began to provide scheduled service to SFB in 2004.

(8) In 2010, Allegiant moved half of their operations from SFB to MCO. Ten months later, Allegiant returned all of its Orlando-based passenger traffic to the Orlando Sanford International Airport.

(9) In 2015, GOAA began to track information about "Sanford Int'l / Allegiant Airlines" using an internal tool called Palitos.

(10) The Palitos information does not report what the traveler's question about a particular topic was. If a traveler asks someone at a GOAA information desk "does Allegiant fly out of your airport," the information agent will likely check a mark in the "Sanford Int'l / Allegiant Airlines" box.

(11) In or around March 2019, GOAA filed a lawsuit against Melbourne Airport Authority ("MLB"), for alleged false advertising and trademark infringement based on MLB's airport name Orlando Melbourne International Airport.

(12) The first time GOAA filed claims in a lawsuit against SAA asserting trademark infringement was when GOAA filed its counterclaim in this action on October 17, 2023, twenty-seven (27) years after SAA changed its airport name to Orlando Sanford International Airport.

(13) Metroplan Orlando is the metropolitan planning organization for Orange, Osceola, and Seminole counties. From at least 2009 to 2017, it released yearly "Tracking the Trends" reports identifying trends affecting highway, transit, aviation, and other transit in "the Orlando Metropolitan Area." In the aviation section, Metroplan's 2016 report states: "One of the Orlando Metropolitan Area's strengths is its rich transportation network.

With large numbers of tourists, business travelers, and residents around Orlando, the area's airports, railroads, and seaport are crucial to the local economy."

(14) Both MCO and SFB have flourished since 1996.

(15) Mayor Hood, an influential member of the GOAA Board in the 1990s, was opposed to GOAA initiating litigation against SAA. James Pugh, Jr, another GOAA Board member, expressed his opinion that he "look[s] forward to our staff working closely with the Sanford Airport staff to reach a favorable conclusion that will be beneficial to both airport facilities."

**b. Defendant's Statement of Each Issue of Fact**

(16) Whether the SAA Marks infringe the GOAA Marks and if so, what damages and/or injunctive relief are to be awarded?

(17) Whether any of SAA's affirmative defenses avoid liability for trademark infringement?

(18) Whether SAA intentionally infringe the Orlando Marks?

12. <u>**Concise Statement of Each Disputed Issue of Law**</u>

(1) Whether the TTAB erred in sustaining the consolidated TTAB Opposition Proceeding No. 91234602 as to SAA's word mark Orlando Sanford International Airport in U.S. Trademark Application Serial No. 87115958.

(2) Whether the TTAB erred in sustaining the consolidated TTAB Opposition Proceeding No. 91234602 as to SAA's design mark in U.S. Trademark Application Serial No. 87115959.

(3) Whether there is any likelihood of confusion GOAA's Marks caused by SAA's use of SAA's Marks.

(4) Whether GOAA's affirmative claims are barred by the statute of limitations.

(5) Whether GOAA's affirmative claims are barred by acquiescence.

(6) Whether GOAA's affirmative claims are barred by estoppel.

(7) Whether GOAA's affirmative claims are barred by laches.

(8) Whether SAA is barred from asserting the defense of genericness because it did not assert a counterclaim for genericness in the Consolidated Opposition Proceeding.

(9) Whether the phrase "Orlando International Airport" in connection with airport services in Orlando is generic, and thus unable to serve as a trademark.

(10) Whether SAA's claims are barred by judicial estoppel where SAA claims the right to register and possess trademark rights in Orlando Sanford International Airport marks while also claiming GOAA has no exclusive right to the phrase Orlando International Airport because it is allegedly incapable of functioning as a trademark.

(11) If GOAA prevails on its federal and/or common law trademark infringement claims, whether GOAA is entitled to damages.

(12) If GOAA prevails on its federal and/or state trademark infringement claims, whether GOAA is entitled to a permanent injunction.

(13) Whether either party is entitled to attorney's fees and costs under the exceptional case standard set forth in the Lanham Act, and if so, the amount of fees to which such party is entitled.

13. **<u>Motions or Other Matters Which Require Action by the Court</u>**

a. Plaintiff's Motion for Summary Judgment and Defendant's Opposition thereto. Doc. 35, 36, 40, 43, and 44.

b. Defendant's Motion and Memorandum for Summary Judgment and SAA's Opposition thereto. Doc. 41, 45, and 48.

c. Plaintiff's Motion to Exclude Expert Report and Opinions of Sarah Butler. Doc. 42.

d. Plaintiff's and Defendant's Motions in Limine (to be filed in accordance with the deadline set forth in the operative CMSO).

e. Plaintiff's Motion to Strike Defendant's jury demand. Doc. 57.

f. Defendant's Motion to Set the Order of Proof at Trial. Doc. 60.

14. **Statement Regarding Usefulness of Further Settlement Discussions**

The parties considered the possibility of settlement of this case and have extensively and exhaustively discussed it. The parties remain at an impasse.

15. **Joint Proposed Jury Instructions, Verdict Form, and Voir Dire Questions**

a. Plaintiff believes this case is no longer appropriate for a jury, and has filed a Motion to Strike Jury Demand and for Bench Trial. Doc. 57. Defendant opposes that motion. The parties have provided the necessary jury instructions, verdict form, and voir dire questions should the Court deny Plaintiff's motion.

b. The parties' Joint Proposed Jury Instructions are attached at **Exhibit G**.

c. The parties' Alternative Proposed Verdict Forms are attached as **Exhibits H1 and H2**.

d. The parties' Joint Proposed Voir Dire Questions are attached as **Exhibit I**.

**LOCAL RULE 3.06(b) CERTIFICATION**

In preparing this final pretrial statement, I have aimed for the just, speedy, and inexpensive resolution of this action.

Date: August 4, 2025


*/s/ Woodrow H. Pollack*
Woodrow H Pollack
Lead Counsel
Fla. Bar No.: 026802
**SHUTTS & BOWEN LLP**
4301 W Boy Scout Blvd, Suite 300
Tampa, Florida 33607
wpollack@shutts.com
(813) 463-4894

Brett Renton
Fla. Bar No.: 41994
**SHUTTS & BOWEN LLP**
300 S. Orange Avenue, Suite 1600
Orlando, Florida 32801
brenton@shutts.com
(407) 423-3200

Jodi-Ann Tillman
Fla. Bar No. 1022214
**SHUTTS & BOWEN LLP**
201 East Las Olas Boulevard
Suite 2200
Fort Lauderdale, Florida 33301
jtillman@shutts.com
(954) 524-5505

*/s/ Stephen H. Luther*
Stephen H. Luther
**Luther Law PLLC**
Lead Counsel
4767 New Broad Street, # 1029
Orlando, FL 32814
sluther@lutherlawgroup.com
407 501-6711 x101 (Main)
407 501-7049 (Direct)

***Attorneys for Defendant Greater Orlando Aviation Authority***

*Attorneys for Plaintiff*
*Sanford Airport Authority*