**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**SANFORD AIRPORT
AUTHORITY,**

    **Plaintiff,**

v.　　　　　　　　　　　　　　Case No: 6:23-cv-1563-PGB-DCI

**GREATER ORLANDO
AVIATION AUTHORITY,**

    **Defendant.**
_____/

**ORDER**

  This case is before the Court on Plaintiff Sanford Airport Authority's ("**Plaintiff**") Motion to Exclude Expert Report and Opinions of Sarah Butler. (Doc. 42 (the "**Motion**")). The Defendant Greater Orlando Aviation authority ("**Defendant**") submitted a Response in Opposition. (Doc. 46 (the "**Response**")). Upon consideration, the Plaintiff's Motion is granted.

**I.　BACKGROUND**

  The matter before the Court is whether the Defendant's expert, Sarah Butler ("**Ms. Butler**"), offers opinions based on a reliable methodology that would be helpful to the jury. (*See generally* Doc. 42). The Plaintiff seeks review of a final decision by the Trademark Trial and Appeal Board ("**TTAB**") upholding the opposition to the Plaintiff's trademark registrations. (Doc. 1, pp. 13–15). The Plaintiff also requests a declaratory judgment that there is no likelihood of

confusion between the Plaintiff's trademarks and the Defendant's Design Registration or the Defendant's claim to the term "Orlando International Airport." (*Id*. at pp. 15–17). The Plaintiff further seeks a declaration that "Orlando International Airport" is a generic term for international airport services in Orlando, Florida, and not capable of trademark.[1] (*Id*. at pp. 15–19).

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion. FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as a gatekeeper, to ensure that all scientific testimony or evidence admitted is not only relevant, but reliable. District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). This gatekeeping role applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'otherwise specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 141–42 (1999) (citing FED. R. EVID. 702).

---

[1]   The Court stayed the Defendant's counterclaims that Plaintiff's use of the Orlando Sanford International Airport marks infringes their senior trademark rights, and the likelihood of confusion, mistake, and deception due to the similarity of the marks. (Doc. 85, p. 4).

2

That said, usually "the rejection of expert testimony is the exception rather than the rule." *See* Advisory Committee Notes to the 2000 Amendment to Rule 702. And the district court's role as a gatekeeper "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citations and quotation marks omitted). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Id.* On the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citation and quotation marks omitted). Within this context, the party offering an expert opinion has the burden of establishing three criteria: qualification, reliability, and helpfulness. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

First, the witness must be "qualified to testify competently regarding the matters [s]he intends to address." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Indicia of an expert's qualifications may be evidenced by education, training, work experience, publication in the pertinent field, and membership in professional societies. *See Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990). Second, the expert witness must employ "sufficiently reliable" scientific methods or principles to form her opinions. *Rink*, 400 F.3d at 1291. The reliability of an expert's methodology can be evaluated by considering a wide range of factors, including: (1) whether the expert bases her opinion on

sufficient facts or data; (2) whether the expert unjustifiably extrapolates her research to reach an unfounded conclusion; (3) whether the expert considers or accounts for contradictory studies or data; (4) the extent to which the methods used rely on the expert's subjective interpretations; and (5) whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94.

Third, the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591 (citing FED. R. EVID. 702). Expert testimony helps where it concerns matters beyond the ken of the average juror and will allow the jury to understand the evidence or to resolve a factual dispute. *See Kumho Tire*, 526 U.S. at 148–49. Conversely, there will be no need for an expert's opinion when the jury can decide a disputed issue by applying common sense or simple logic, considering the evidence and testimony presented at trial. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Federal Rule of Evidence 403. *Daubert*, 509 U.S. at 591.

### III. DISCUSSION

The Defendant asks the Court to permit the jury to consider and, if appropriate, rely on a 2016 survey conducted by Ms. Butler in connection with a lawsuit involving the Melbourne Airport Authority. (Doc. 42, p. 1; Doc. 42–1, ¶¶ 3, 13). The instant litigation follows the TTAB's final decision issued on March 14,

2023, concerning the Plaintiff's Marks and the Defendant's Marks. (Doc. 1). Why the Defendant chose not to conduct a more recent survey to determine whether Plaintiff's Marks are likely to be confused with Defendant's Marks is a mystery. Setting that aside, the Plaintiff's expert, Mr. Brian Sowers ("**Mr. Sowers**"), reviewed Ms. Butler's methodology and conclusions and identified several flaws in both. (Doc. 42–2).

> Mr. Sowers lists the following deficiencies in Ms. Butler's methodology:
>
>> (1) the survey fails to establish a timeframe for secondary meaning;
>>
>> (2) the survey population was not properly defined or screened for qualification;
>>
>> (3) the survey does not use a proper control;
>>
>> (4) the survey question purporting to test secondary meaning is flawed;
>>
>> (5) survey questions are leading and likely introduced a demand effect; and
>>
>> (6) low-quality responses to open-ended questions undermine overall data quality.
>
> (*Id.* ¶ 15).

Mr. Sowers opines that the survey fails to establish whether the Defendant's mark "Orlando International Airport" had acquired secondary meaning by the time the Plaintiff's allegedly infringing marks entered the market. (*Id.* ¶ 20). The Orlando Sanford International Airport mark came into use in 1996, but the survey does not address whether the Defendant's mark had acquired secondary meaning at that time. (*Id.* ¶¶ 23, 72). Mr. Sowers contends that the proper methodology

5

required the survey to be conducted within five years of the junior user's first use of the accused Mark. (*Id.* ¶ 24); *see also Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1116–17 (Fed. Cir. 1992) (citing *Braun, Inc. v. Dynamics Corp. of Am.,* 975 F.2d 815, 826 (Fed. Cir. 1992)) ("In any infringement action, the party asserting trade-dress protection must establish that its mark had acquired secondary meaning before the first infringing use by each alleged infringer."). In 1995, the Defendant was advised by counsel to conduct a survey to determine whether Plaintiff's mark was confusingly similar and to voice their objection to the Plaintiff's continued use of their mark. (Doc. 1–9, pp. 14–15). Yet, the Defendant failed to act on that advice and did not raise their objection until 2017. (*Id.* at p. 15). Accordingly, Ms. Butler's survey, conducted twenty years later, cannot establish that the Defendant's mark acquired secondary meaning in 1996. (*See* Doc. 42, p. 1; Doc. 42–1, ¶¶ 3, 13).

The Defendant concedes that the survey was not intended to, and does not, show that the Defendant's mark has priority over the Plaintiff's. (Doc. 46, pp. 1–2, 5). The Defendant offers three reasons why Ms. Butler's survey remains relevant—none of which are compelling: first, a survey may be relevant when "a mark acquires substantial recognition among consumers, but later loses that recognition before the mark holder brings suit;" second, a mark can acquire such recognition that it comes to be understood as a class of goods or services rather than as one provider's goods or services, such that the mark becomes generic and is ineligible for protection; and, third, marks can lose their "source identifying significance …

and Ms. Butler's survey demonstrates that this had not happened for the [Defendant]." (*Id.* at pp. 6–7). The first two professed uses for a survey conducted long after the Plaintiff used the allegedly infringing mark are at issue in this case. The Defendant's third justification for admitting Ms. Butler's survey is nonsensical. The Plaintiff does not allege that the Defendant's mark lost its source-identifying significance after acquiring it. And the fact remains that the Defendant's mark must have acquired secondary meaning before the Plaintiff's first infringing use. Ms. Butler's survey fails to establish either point and is unhelpful to the jury. Notably, the Defendant does not cite a single case, binding or otherwise, to support its claim that a survey conducted twenty years after the Plaintiff first used the mark is relevant. (*Id.*).

The Plaintiff contends that Ms. Butler's opinions—though irrelevant to the core issue of when secondary meaning was established—also rely on an unreliable methodology. (Doc. 42, pp. 7–10). Mr. Sowers submits that the survey population is over-inclusive because respondents aged 18 and older who are likely to travel by air to Florida are not necessarily "in the market" for airport services. (*Id.* at p. 9; *see also* Doc. 42-2, ¶¶ 31–32). Nor does the prompt necessarily include decision-makers for such travel, making it impossible to determine whether any respondents are relevant consumers for assessing secondary meaning (Doc. 42, p. 9; Doc. 42–2, ¶¶ 28, 31); *see Weight Watchers Intern., Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990) (finding the survey was over-inclusive where

7

it was not limited to individuals in the relevant age range who were in the market for diet food).

According to the Defendant, Ms. Butler's survey addresses whether **consumers** view the Orlando International Airport mark as associated with a single service provider.[2] (Doc. 46, p. 2) (emphasis added). Notwithstanding the survey's professed goal, the Defendant contends that confusion by non-consumers of airport services is relevant. (*Id.* at pp. 7–10). The Defendant argues that one person in a group of travelers may purchase tickets or other airport services, and that confusion by any member of the group, including those who did not purchase airline tickets, rent a vehicle, or purchase goods at the airport, is relevant. (*Id.* at p. 8).

Despite the Defendant's obvious about-face, the survey fails to specify whether the respondent is a consumer of any particular airport service. (*See* Doc. 42-1). While the Defendant broadly defines airport services in its response to Plaintiff's *Daubert* motion to include rental car services and restaurants, the pertinent survey question is limited. (Doc. 46, p. 8). The survey is directed to people aged "18 years and older who are likely to travel by air to Florida." (Doc. 42-1, p. 4). The survey asks whether the respondent associates "Orlando International Airport" with the name or location of one airport, the name or location of more than one airport, or [respondent does] not know." (*Id.* at p. 50). The survey does

---

[2] As previously discussed, Ms. Butler's survey does not assess whether Orlando International Airport acquired secondary meaning *before* Plaintiff started using their mark. *See* discussion *supra* pages 5–7.

8

not ask whether the respondent associates rental cars or other "airport services" with Orlando International Airport. The Defendant attempts to bolster its contention that the respondent need not be the purchaser by citing two post-facto deposition testimonies. (Doc. 46, pp. 8–9). However, the survey is either flawed on its face or not. Selecting isolated deposition testimony does not salvage a poorly worded survey. Ms. Butler's survey may therefore capture responses from individuals who have never purchased an airline ticket to Orlando International Airport but still believe Orlando International Airport is a single airport. The survey population is overly inclusive, rendering the methodology flawed.

The Plaintiff also alleges that Ms. Butler's survey questions were unreliable because they were leading and improperly suggestive. (Doc. 42, p. 11). Plaintiff contends, and the Court agrees, that the survey creates a demand effect and cues the respondent to identify the "correct" answer. (*Id.*). Inexplicably, Ms. Butler's control mark was "Florida International Airport." (Doc. 42-1, ¶¶ 22, 24). In the Airport Survey Control, respondents are asked whether they associate Florida International Airport with the name or location of one airport, more than one airport, or do not know. (*Id.* at p. 78). Mr. Sowers correctly notes that Ms. Butler should have replaced Orlando with another major Florida city, for example, Hialeah International Airport. (Doc. 42-2, ¶¶ 37–38). The survey does not offer a plausible choice between the State of Florida and a city.[3] (*Id.* ¶ 39).

---

3   The survey is also ambiguous because it is unclear whether the respondent identifies
    Orlando International Airport as "the name" of one airport, more than one airport, or the

9

The Plaintiff also argues that Ms. Butler's opinions are not relevant to the genericness issue. (Doc. 42, p. 13). Defendant claims entitlement to use the word "Orlando" in connection with international airport services. (*Id.*). However, a generic name is ineligible for federal trademark protection. *See U.S. Pat. & Trademark Off. v. Booking.com, B.V.*, 591 U.S. 549, 551 (2020). Ms. Butler concedes at deposition that she did not conduct a genericness survey. (Doc. 42-3, 55:10—56:6). Her survey was limited to whether Orlando International Airport has secondary meaning. (*Id.* at 9:18—10:9). Plaintiff correctly notes that no amount of secondary meaning saves a phrase from being generic. (Doc. 42, p. 13). And Ms. Butler's survey does not address genericness. Defendant claims Plaintiff cannot raise genericness in this procedural setting. (Doc. 46, p. 16). Whether Plaintiff may seek a declaratory judgment of trademark invalidity for genericness is not at issue in a *Daubert* challenge and may become relevant at a later date. Plaintiff is correct that Ms. Butler's report does not address genericness, and so she may not offer opinions on that topic.

## IV.   CONCLUSION

For the reasons stated herein, the methodology Ms. Butler employed in preparing and executing the survey is unreliable. Accordingly, the Plaintiff's Motion to Exclude Ms. Butler's Report and Opinions (Doc. 42) is **GRANTED**.

**DONE AND ORDERED** in Orlando, Florida on February 2, 2026.

---

respondent does not know, or as "the location" of one airport, more than one airport, or the respondent does not know. (Doc. 42-1, p. 51).

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

11