## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**SANFORD AIRPORT**
**AUTHORITY,**

       **Plaintiff,**

   **v.**                        **Case No.:  6:23-cv-01563-PGB-DCI**

**GREATER ORLANDO AVIATION**
**AUTHORITY,**

       **Defendant,**

_____/

### ORDER

This cause is before the Court on Plaintiff Sanford Airport Authority's ("**Plaintiff**" or "**SAA**") Motion for Summary Judgment. (Doc. 35 (the "**Motion**")). Defendant Greater Orlando Aviation Authority ("**Defendant**" or "**GOAA**") filed a Response in Opposition (Doc. 43 (the "**Response**")), and SAA submitted a Reply. (Doc. 44 (the "**Reply**")). Upon consideration, Plaintiff SAA's Motion is granted in part and denied in part.[1]

## I.    BACKGROUND

The Plaintiff seeks review of a final decision by the Trademark Trial and Appeal Board ("**TTAB**"), which upheld the Defendant's opposition to the Plaintiff's registrations. (Doc. 1, pp. 13–15). The Plaintiff also requests a declaratory

---

[1]    The Court grants SAA's Motion on the defense of laches and acquiescence but denies summary judgment on the issue of likelihood of confusion.

judgment that there is no likelihood of confusion between the Plaintiff's trademarks and the Defendant's Design Registration or the Defendant's claim to the words ORLANDO INTERNATIONAL AIRPORT, along with a declaratory judgment on acquiescence and a declaration that the term ORLANDO INTERNATIONAL AIRPORT is generic for international airport services in Orlando, Florida. (*Id.* at pp. 15–19). The Defendant brings a counterclaim for trademark infringement and unfair competition. (Doc. 13, pp. 19–23). The Plaintiff seeks summary judgment on its defenses of laches and acquiescence, and in its favor on GOAA's counterclaim for trademark infringement due to the absence of evidence showing a likelihood of consumer confusion in the marketplace.[2] (Doc. 35, pp. 12–25; *see also* Doc. 19, p. 7, ¶¶ 3–4).

## II.    LEGAL STANDARD

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A).

---

[2]    In its counterclaim, GOAA seeks to permanently enjoin SAA from any further use of the words "Orlando Sanford International Airport," using "Orlando" in Sanford's name, affirmance of the TTAB's finding that SAA is not entitled to trademark registrations, damages resulting from the infringing acts, and assignment of SAA's rights and ownership interests in marketing material and domain names that infringe GOAA's marks. (Doc. 13, pp. 23–24).

"The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). "The court need consider only the cited materials" when resolving a motion for summary judgment. FED. R. CIV. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs and the arguments raised therein).[3]

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor.[4] *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). But, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162

---

[3] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

[4] That said, "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Dropbox, Inc. v. Thru Inc.*, Case No. 15-cv-01741-EMC, 2016 WL 6696042, at *3 (N.D. Cal. Nov. 15, 2016) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

(11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990));
*see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586
(1986) ("When the moving party has carried its burden under Rule 56(c), its
opponent must do more than simply show that there is some metaphysical doubt
as to the material facts." (citations omitted)).  Furthermore, "[p]artial summary
judgment may properly be granted on affirmative defenses." *Eli Rsch., LLC v. Must
Have Info Inc.*, No. 2:13-CV-695-FTM-38CM, 2015 WL 5934632, at *2 (M.D. Fla.
Oct. 6, 2015) (citing *Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209,
1218 (M.D. Fla. 2007)).

## III.   DISCUSSION

### A.   Laches

"The equitable defense of estoppel by laches may be applied to bar Lanham
Act claims." *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp.,
LLC*, 7 F.4th 989, 1005 (11th Cir. 2021) (cleaned up). To prevail on this defense,
SAA must show: (1) GOAA delayed in asserting a right or a claim; (2) that the delay
was not excusable; and (3) that there was undue prejudice to SAA. *Kason Indus.,
Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997). Since
the Lanham Act does not provide a specific statute of limitations, the Court
borrows Florida's four-year statute of limitations. *Dropbox, Inc.* 2016 WL
6696042, at *2 (citation omitted); *see also AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d
1531, 1546 (11th Cir. 1986).

Delay in determining whether laches applies is calculated from the moment GOAA "'knows or should know [it] has a provable claim for infringement.'" *Pinnacle Advert. & Mktg. Grp., Inc.*, 7 F.4th at 1006 (citation omitted). "'[T]he law is well settled that . . . [GOAA] is chargeable with such knowledge as [it] might have obtained upon inquiry, provided the facts already known by [GOAA] were such as to put upon a man of ordinary intelligence the duty of inquiry.'" *Dropbox, Inc.*, 2016 WL 6696042, at *3 (citation omitted).

To determine when GOAA knew or should have known it had a valid infringement claim, the Court must consider the following non-exhaustive factors: (1) the type of mark, (2) the similarity of the parties' marks, (3) the similarity of the parties' goods or services, (4) the similarity of the parties' retail outlets and customers, (5) the similarity of the advertising media, (6) the alleged infringer's intent in choosing its mark, and (7) actual confusion. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). The "type of mark and the evidence of actual confusion are the most important" of these factors. *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239 (11th Cir. 2008) (citation omitted).

### 1.    When GOAA Knew or Should Have Known

The first question to address is when SAA started using a mark that GOAA knew or should have known was likely to offend its mark. Specifically, does "Orlando Sanford Airport" offend GOAA's mark, or does only "Orlando Sanford *International* Airport" do so? The former name was adopted after Sanford's governing body voted to change the airport's name from Central Florida Regional

Airport to Orlando Sanford Airport on April 4, 1995. (Doc. 36-1, ¶ 4). There is no dispute that GOAA became aware of SAA's name change to Orlando Sanford Airport at that time. SAA again changed the airport's name in 1996, this time to Orlando Sanford *International* Airport. (Doc. 35, p. 3; Doc. 36-27, ¶ 5 ("**Declaration of George Speake, Jr.**")). However, GOAA's vice president of marketing services claims that GOAA did not learn of SAA's change of name to Orlando Sanford International Airport until 2012. (Doc. 36-26, 18:16–23). As discussed below, the record evidence contradicts GOAA's position, and the addition of "International" to SAA's mark is not outcome-determinative.

### 2.    *GOAA Knows of "Orlando Sanford Airport" by May 1995*

On May 17, 1995, the GOAA Board reported that "an airport 30 miles north of this airport is using our name and [Board Member Mr. Pugh] believes that it is misleading and confusing. Action needs to be taken to address this issue." (Doc. 36-1, ¶ 19 (citing Doc. 36-8, at GOAA - 00360)). The GOAA Board voted to have its legal counsel address this problem. (*Id.*). Soon after, on June 14, 1995, GOAA's legal counsel issued an opinion letter recommending that GOAA discuss its concerns with SAA and, if no resolution is reached, to conduct a survey on the likelihood of confusion. (*Id.* ¶ 20). On June 29, 1995, GOAA's executive director, Robert B. Bullock ("**Mr. Bullock**"), met with SAA executives to discuss GOAA's concerns about SAA using Sanford Orlando Airport as its mark. (*Id.* ¶ 22). The next day, Mr. Bullock, acting on behalf of GOAA, wrote to SAA stating that GOAA "believe[s] that there is a strong likelihood of confusion, and therefore, disservice

to the visitor with two airports having a similar-type name." (*Id.* ¶ 23 (citing Doc. 36-13, at Sanford000697)). After discussing areas of mutual benefit, Mr. Bullock stated, "I do believe that the issue of the like names of the airports is pivotal, and the current similarity in names unnecessarily complicates our mutual efforts to capitalize on these opportunities." (*Id.*)

In his letter to Mr. Stephen J. Cooke ("**Mr. Cooke**"), Director of Aviation for SAA, Mr. Bullock emphasized the likelihood of confusion between Orlando International Airport and Sanford Orlando Airport, writing:

> [b]ased on comments from our General Sales Agent in the UK as well as Board members and staff, we believe that there is a strong likelihood of confusion and, therefore, disservice to the visitor with two airports having a similar-type of name. I offered to participate in a survey which might take some of the subjectivity out of this issue but I understand you need some time to consider this idea.

(Doc. 36-13, at Sanford000697).

Although GOAA chose not to conduct a survey to confirm its belief that SAA's mark likely causes confusion, it is clear that GOAA was aware of evidence of confusion by 2010. (Doc. 36-1, ¶ 25). Mr. Phillip Brown ("**Mr. Brown**"), GOAA's Chief Executive Officer and its designated Rule 30(b)(6) witness, testified that, in 2010, he was in the west hall of Orlando International Airport when a passenger asked him where Allegiant Airlines' ("**Allegiant**") gate was. (Doc. 44-1, 5:16–19, 7:4–6, 14:21–15:12). Mr. Brown told the passenger that Allegiant operates out of Sanford. (*Id.*). He also testified that GOAA has known that Sanford has used the name "Sanford International Airport" for about 20 years. (*Id.* 12:15–17, 12:18–

13:7). Mr. Brown explained that "[t]he issue was the use of Orlando and the designation of Sanford International Airport." (*Id.* 12:18–13:7).

Additionally, in response to SAA's interrogatory number 4, GOAA stated that, "Robert Bullock from GOAA met with representatives from Sanford on June 29, 1995, and also wrote to Sanford on June 30, 1995, regarding GOAA's concerns about the potential for confusion between the Orlando International Airport marks and the Orlando Sanford International Airport mark." (Doc. 36-1, ¶¶ 22–23). In response to SAA's interrogatory number 5, GOAA stated that "[s]hortly after Sanford adopted the Orlando Sanford International Airport mark, Robert Bullock from GOAA met with Sanford representatives on June 29, 1995, and also wrote to Sanford on June 30, 1995, regarding GOAA's concerns about the potential for confusion between the Orlando International Airport marks and the Orlando Sanford International Airport mark." (Doc. 36-10, p. 6). The record evidence, including GOAA's admissions in response to interrogatories and the testimony of its corporate representative, contradicts Mr. Jeremy Harris's ("**Mr. Harris**") deposition testimony that GOAA first became aware that Sanford was using the name Orlando Sanford International Airport in 2012.[5] (Doc. 36-26, 18:16–23; Doc. 43, p. 6).

---

[5] Mr. Harris testified in his capacity as the assistant vice president of marketing services for GOAA. (Doc. 36-26, 7:1–9). He was not GOAA's corporate representative, and, even taking his testimony as true, an assistant vice president of marketing services' knowledge as to Sanford's use of the mark Orlando Sanford International Airport does not equate to GOAA being ignorant of Sanford's use of the mark. This is particularly so where, as here, GOAA's 30(b)(6) witness testified to having knowledge of the alleged infringement, as corroborated by GOAA's answers to SAA's interrogatories. (*See* Doc. 36-10, pp. 6–7).

GOAA conveniently ignores its responses to SAA's interrogatories and the testimony of Mr. Bullock, GOAA's corporate representative, when claiming ignorance about Sanford's use of the Orlando Sanford International Airport mark until 2012. The fact that GOAA's vice president of marketing services, Mr. Harris, may have been unaware that Sanford had used Orlando Sanford International Airport since the mid-1990s does not create a material issue of fact regarding GOAA's knowledge. *Dropbox, Inc.*, 2016 WL 6696042, at *3. Allowing otherwise would encourage a party opposing summary judgment to obstruct the process by producing a witness with incomplete knowledge to create an issue of fact.

It is noteworthy that Mr. Harris admitted that GOAA was "more concerned of the use of Orlando [by SAA in its mark] and implying that the airport is in Orlando." (Doc. 36-26, 22:10–23). That is, GOAA was not concerned by the inclusion of the word "International" in SAA's mark. (*Id.*). Mr. Harris testified that GOAA knew SAA was using the name "Orlando" in its mark since at least 1996. (*Id.* 23:5–7). While GOAA knew SAA was using the Orlando Sanford International Airport mark by mid-1995, its concern that SAA's mark created a "strong likelihood of confusion and, therefore, [a] disservice to the visitor with two airports having a similar-type of name" was driven by SAA's use of the word "Orlando" in its name. (Doc. 36-13). According to Mr. Harris, the inclusion of the word "International" in the mark did not raise concerns about consumer confusion. (Doc. 36-26, 22:15–23, 80:8–12). Therefore, it is immaterial that Mr. Harris claims ignorance over

SAA's inclusion of the word "International" in its mark until 2012.[6] GOAA "is chargeable with such knowledge as [it] might have had upon inquiry." *Dropbox, Inc.*, 2016 WL 6696042, at *3. Both airports offer airport services and are located just 25 miles apart. (Doc. 36-1, ¶ 1). Here, GOAA knew SAA was using Orlando Sanford Airport by mid-1995 and knew, or should have known, it incorporated "International" into its name shortly thereafter.[7]

### 3. GOAA Delayed in Asserting its Infringement Claim and the Delay was not Excusable

As discussed earlier, in May 1995, GOAA's Board addressed the issue that "an airport 30 miles north of [GOAA] is using our name and [Board Member Mr. Pugh expressed his belief] that it is misleading and confusing." (Doc. 36-1, ¶ 19 (citing Doc. 36-8, at GOAA - 00360)). The Board regarded the likelihood of confusion as serious and asked GOAA's legal counsel to prepare an opinion letter. (*Id.* ¶¶ 19–20). On June 14, 1995, GOAA's counsel advised addressing concerns with SAA and, if dissatisfied with SAA's response, to conduct a survey on potential confusion. (*Id.* ¶ 20). GOAA's executive director, Mr. Bullock, met with SAA's

---

[6]  While not dispositive here, the TTAB found that SAA changed its mark to "Orlando Sanford International Airport" in 1996 and has offered airport services under that mark continuously since at least December 31, 1996. (Doc. 1-9, p. 13). The TTAB also found that both GOAA and SAA "have disclaimed the elements INTERNATIONAL AIRPORT, [in] an acknowledgement that these terms are descriptive and generally have less significance in likelihood of confusion." (*Id.* at p. 36); *see In re Nat'l Data Corp.*, 753 F.2d 1056, 1060 (Fed. Cir. 1985) ("descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion); *see also In re Code Consultants, Inc.*, 60 U.S.P.Q.2d 1699, 1702 (T.T.A.B. 2001) (disclaimed matter is often "less significant in creating the mark's commercial impression").

[7]  Mr. Brown, GOAA's CEO, also testified that the use of the word "Orlando" by SAA was confusing. (Doc. 44-1, 13:1–7).

leadership, then sent a letter to Mr. Cooke, SAA's Director of Aviation, highlighting the likelihood of confusion based on SAA's mark. (*Id.*; Doc. 36-13). Therefore, GOAA knew in June 1995 that SAA's mark posed a "strong likelihood of confusion," yet it never arranged a survey to pursue an infringement claim.

Mr. Harris explained that GOAA knew SAA was using a name that concerned GOAA's Board, but the idea of pursuing legal action for infringement "didn't really occur [to GOAA] until we started tracking specific confusion about Sanford, or the use of the name, which would have been in 2015." (Doc. 36-13, 59:12–17). Consequently, by May 1995, GOAA believed SAA's mark created a "strong likelihood of confusion" and posed a "disservice to the visitor" due to the similarity between their marks, but it did not start tracking customer confusion until 2015. GOAA's decision to wait until 2015 to gather data on whether the name "Orlando Sanford International Airport" was causing consumer confusion cannot be reconciled with the concerns raised during Board meetings twenty years earlier or with its CEO's testimony that, by 2010, he personally encountered a customer who mistakenly thought Allegiant served GOAA's airport instead of departing from SAA's airport. (Doc. 44-1, 14:21–15:12).

In *Pinnacle Advert. & Mktg. Grp., Inc.*, 7 F.4th at 985, the plaintiff sued under the Lanham Act, and the defendant asserted that the claims were barred by the doctrine of laches. The plaintiff learned of the defendant's mark during a meeting with the Central Florida Honda Dealers Association, when asked if the plaintiff was affiliated with the defendant. *Id.* at 996. During discovery, the

plaintiff's CEO answered the defendant's interrogatory, acknowledging that the plaintiff learned of the defendant's mark during that meeting. *Id.* The plaintiff's CEO testified that he overheard a conversation during which a person at the meeting was confusing the plaintiff with the defendant. *Id.* The CEO later claimed that he first became aware of the defendant's confusingly similar mark two years later when an industry magazine mistakenly linked the defendant's website in an article about the plaintiff. *Id.* The plaintiff brought suit against the defendant more than four years after the Central Florida Honda Dealers Association meeting. *Id.* at 997. The Eleventh Circuit affirmed the trial court's judgment as a matter of law on the laches defense, citing the plaintiff's responses to the defendant's interrogatories. *Id.* at 1006–07.

The court also rejected the plaintiff's contention that the defendant progressively encroached on its mark and that the delay should be calculated from the second time the plaintiff and the defendant were confused in a trade publication. *Id.* at 1008. The trial court found, and the Circuit Court affirmed the ruling, that the plaintiff was on notice after the pitch meeting that another entity was using a similar mark in the same advertising and marketing industry, that the plaintiff's potential client was aware of that entity, that the defendant was operating in a geographic location where the plaintiff sought customers, and that the defendant knew that at least one instance of actual confusion had occurred. *Id.* Here, the GOAA Board was on notice since at least 1996 that SAA used a similar-type mark that created a strong likelihood of confusion, that SAA advertised in the

market for Greater Orlando as did GOAA, that consumers were aware of the
Orlando Sanford International Airport mark, and that GOAA's CEO was aware of
at least one instance of actual confusion occurring in 2010. Accordingly, at the
latest, the clock for calculating delay began in 2010, and GOAA did not file an
opposition to SAA's trademark application until July 26, 2016, and filed its
counterclaim for infringement on October 27, 2023. (Doc. 1-9, p. 2 n.2; Doc. 36-1,
¶ 39; *see also* Doc. 13). GOAA therefore delayed more than four years in asserting
its right or claim. The facts of this case are strikingly similar to the facts of *Pinnacle
Advert. & Mktg. Grp., Inc.*

Confronted with GOAA's Board meetings during which the "strong
likelihood of confusion" was discussed, which prompted meetings and
correspondence between GOAA and SAA's leadership, and Mr. Brown's first-hand
experience with customer confusion in 2010, GOAA offers excuses for failing to act
to protect its mark. None of the proffered excuses hold up.

### a.    *Statutory Mandate to Avoid Litigation*

GOAA argues that the parties are legally required to avoid litigation "to the
maximum extent possible" as a reason for not starting legal proceedings earlier.
(Doc. 43, p. 3). GOAA dedicates one paragraph to this argument and claims they
"tried at every turn [] to resolve its dispute with Sanford by Agreement." (*Id.*). "It
is axiomatic that arguments not supported and properly developed are deemed
waived." *W. Sur. Co. v. Steuerwald*, No. 16-61815-CV, 2017 WL 5248499, at *2
(S.D. Fla. Jan. 17, 2017); *see also U.S. Steel Corp v. Astrue*, 495 F.3d 1272, 1287

n.13 (11th Cir. 2007) (noting that the court need not consider "perfunctory and underdeveloped" arguments and that such arguments are waived). GOAA's unsupported claim that its delay in initiating legal proceedings is justified by Section 164.102, Florida Statutes does not warrant serious consideration. The idea that a single meeting followed by a letter, which occurred 21 years before GOAA objected to SAA's marks, excuses inaction is not reasonable. Under this logic, the holder of a mark, if it is a Florida state entity, can avoid the equitable doctrine of laches simply by having one meeting or sending a letter expressing concern about confusion, regardless of how long they waited while the alleged infringer invested capital to promote its mark. GOAA cites no authority for this premise, because none exists. Accordingly, this excuse for inaction is rejected by the Court.

### b.    *Plaintiff's Conflicting Positions*

GOAA contends that summary judgment on SAA's laches defense should be denied because SAA contradicts its claim that GOAA had a provable claim of likely confusion years ago while also arguing that GOAA cannot point to meaningful instances of actual confusion to support its infringement counterclaim. (Doc. 43, p. 4). GOAA notes that "'for the court to issue a summary judgment under Rule 56, there must be no disputed questions of fact or conflicting inferences to be drawn from undisputed facts, which, if settled against the moving party, would allow the plaintiff to recover.'" (*Id*. at p. 9 (quoting *Sheets v. Burman*, 322 F.2d 277, 278 (5th Cir. 1963))). This argument misses the mark. The issue before the Court is whether the undisputed facts support SAA's Motion on its defense of laches, not whether

the undisputed facts support **both** SAA's laches defense and its claim that GOAA
cannot prove infringement. The undisputed facts are as the Court has recounted:
GOAA knew SAA was using the Orlando Sanford International Airport mark by at
least 1996; GOAA knew SAA's mark created a strong likelihood of confusion by
June 1995; GOAA never conducted a survey, electing to co-exist with SAA until
2017 when it opposed SAA's trademark application; and GOAA had actual
knowledge of customer confusion by 2010. The only issue before the Court is
whether these facts are sufficient to support summary judgment.

        c.     *GOAA Pursued Claims within Two Years of
             Knowing it Had a Provable Claim*

In May 1995, GOAA's Board held the firm opinion that an airport located
"30 miles north of" the Orlando International Airport "is using our name" and
found that use to be "misleading and confusing." (Doc. 36-1, ¶ 19). GOAA's CEO,
Mr. Brown, and Plaintiff's designated Rule 30(b)(6) witness admitted GOAA new
about "Sanford's use of the name [Orlando] Sanford International Airport" for
about 20 years." (Doc. 44-1, 12:15–17, 13:1–7). Mr. Brown conceded that the use of
the word "Orlando" gave rise to the confusion. (*Id.* 14:21–15:12). As previously
discussed, Mr. Harris was similarly focused on the use of "Orlando" in SAA's mark
when discussing the likelihood of confusion. (Doc. 36-26, 22:10–23). GOAA now
reverses course and claims the word "International" is a key factor in creating
confusion. (Doc. 43, p. 5). GOAA staked out the position in deposition that the

word "Orlando" was confusing, and GOAA's position cannot be flipped simply to suit its current needs.

Even so, GOAA supports its claim that the introduction of "International" in SAA's mark is the event that caused consumer confusion by citing a single individual, deposed in April 2025. (Doc. 41, p. 9). This person "submitted a complaint to the Orlando International Airport a number of years ago" regarding a flight he booked in 2016 or 2017 departing Sanford. (Doc. 41-28, 4:1–22, 9:24– 10:21). The witness booked his flight "out of Sanford International Airport, not realizing it was [located in] Sanford, and [he] mistakenly went to Orlando International Airport." (*Id*. 10:8–10). The witness testified that he normally departed from Tampa, but no suitable flight to Little Rock was available. (*Id*. 15:14–16:10). The witness further stated that he "never realized that there was an Orlando International Airport Sanford and Orlando International Airport . . . [s]o I guess **I didn't pay enough attention** to note that the airport I booked the flight out of was not Orlando International Airport, so –– and I made that assumption that it was." (*Id*. 16:7–10 (emphasis added)). This testimony does not support the premise that the inclusion of "International" in SAA's mark was the catalyst for confusion. At best, this testimony speaks to the witness's inattentiveness. Regardless, GOAA knew long before this incident that SAA had been using the mark "Orlando Sanford International Airport," its recent claim to the contrary notwithstanding.

16

GOAA's argument that it did not have a "provable claim" for infringement until this witness submitted his complaint "some years ago," meaning some time after he attempted to book his trip to Little Rock in 2016 or 2017, does not hold up. GOAA submits that a single customer who books a flight departing from Sanford but mistakenly arrives at the Orlando International Airport starts the clock for measuring delay because that event gave rise to a provable claim for infringement. (Doc. 43, pp. 1, 5–6). If this is true, GOAA knew it had a provable claim in 2010 when its CEO was approached by a customer who booked a flight on Allegiant departing from Sanford and arrived at the Orlando International Airport believing the flight left from there. Following GOAA's reasoning, GOAA had until 2014 to initiate a claim for infringement and failed to act.

GOAA also argues in its Response that "GOAA did not know it had a provable claim when Sanford announced its change to 'Orlando Sanford Airport' without 'International.'" (Doc. 43, p. 1). Stated differently, the inclusion of "International" in the mark provided GOAA with the requisite knowledge that it had a provable claim. Setting aside that GOAA's representatives identified the word "Orlando" as the cause of confusion, GOAA's CEO admitted that it knew SAA used the Orlando Sanford International Airport mark long before 2012. GOAA's answers to SAA's interrogatories confirm this fact. As such, by its own admission, GOAA knew it had a provable claim well before 2012 and failed to act. Under either set of reasoning, GOAA failed to act on its claim on time, and the defense of laches applies.

Next, GOAA argues that, notwithstanding the Board's concern in May 1995 that SAA's mark gave rise to a "strong likelihood of confusion," Sanford was principally servicing charter/package tour service, and "'[c]onfusion [was] almost never a factor' for Sanford's business at the time." (Doc. 36-1, ¶ 23; Doc. 43, p. 10). Therefore, GOAA posits, "how could [confusion] loom large." (Doc. 43, p. 10). GOAA does not identify when SAA was principally servicing charter/package tour service. Accordingly, GOAA fails to explain how SAA's business model during this presumably earlier, but unspecified timeframe, affects the Court's determination of the starting point for calculating delay. The Court need not consider undeveloped arguments. *See W. Sur. Co.,* 2017 WL 5248499, at *2. Regardless, GOAA's CEO was aware of actual customer confusion that did not involve charter or package tour service by 2010, and Allegiant began scheduled service at SAA in 2004 — six years earlier and long after GOAA knew of SAA's mark. (Doc. 36-27, ¶ 21; Doc. 36-26, 39:3–18, (noting that Allegiant started flying to Sanford in 2005 and previously served GOAA)).

Finally, GOAA relies on the doctrine of progressive encroachment to excuse its delay in asserting a claim for infringement. (Doc. 43, pp. 6–7). This argument fails for the reasons already discussed. By 2005, GOAA knew Allegiant served SAA and knew SAA was using the Orlando Sanford International Airport mark. GOAA knew of the strong likelihood of confusion: its CEO encountered actual confusion firsthand five years later, and yet GOAA sat on its rights. It does not matter, for the purpose of determining the commencement date for calculating delay, that SAA

may have provided charter/package tour service years earlier. By at least 2005,
GOAA knew that SAA's mark was similar, that they both provided similar goods
and services,[8] SAA's intent in selecting its mark to service the Greater Orlando
market, and, by 2010, knew of actual confusion. (Doc. 36-1, ¶¶ 1–3, 21, 23). GOAA
had a provable claim for infringement by at least 2005 and no later than 2010.
*Aronowitz*, 513 F.3d at 1239. For these same reasons, in *Pinnacle Advert. & Mktg.
Grp., Inc.*, the Eleventh Circuit affirmed the trial court's rejection of the doctrine
of progressive encroachment. 7 F.4th at 1008.

### d.    The Clock on Laches Started in 2015

GOAA dedicates one paragraph to its assertion that the clock does not start
on SAA's laches defense until GOAA bothered to start tracking customer confusion.
(Doc. 43, pp. 7–8). GOAA claims, without citation to any legal authority, that the
clock for laches does not start until it began tracking customer confusion with its
"Palitos reports in 2015." (*Id.*). "[T]he law is well settled that . . . [GOAA] is
chargeable with such knowledge as [it] might have obtained upon inquiry,
provided the facts already known by [GOAA] were such as to put upon a man of
ordinary intelligence the duty of inquiry." *Dropbox, Inc.*, 2016 WL 6696042, at *3.
To accept GOAA's argument that it can dictate when the clock starts for laches by
waiting to investigate customer confusion turns *Dropbox, Inc.,* and the doctrine of

---

[8]    GOAA's CEO, Mr. Brown, defined its customers as passengers, air carriers, rental car
companies, ground transportation companies, and food and beverage concessionaires. (Doc.
44-1, 19:23–20:2). These are the same goods and services provided by SAA as late as 2004–
2005.

laches, on its head. The clock started when GOAA knew or was chargeable with such knowledge that a man of ordinary intelligence had a duty of inquiry. In June 1995, GOAA's counsel suggested it conduct a survey to document customer confusion. By 2005, GOAA knew Allegiant was flying from the Orlando Sanford International Airport, and by 2010, GOAA's CEO encountered a customer who was actually confused. Yet, GOAA never conducted a survey to assess customer confusion. GOAA delayed until 2015 to "empirically track[]" confusion with its Palitos reports[9] – more than four years after its CEO knew of actual confusion and decades after it voiced concern over the "strong likelihood of confusion" expressed by its Board.

GOAA also contends that the delay clock ended when GOAA opposed SAA's Mark in 2017. Even assuming this to be true, GOAA's opposition to SAA's Mark was filed well beyond the four year limitation; the delay is not excusable, and the doctrine of laches applies.

### 4.    SAA has Suffered Undue Prejudice

"[M]ere delay, without resulting injury to defendant, is not sufficient to prevent relief for infringement." *Pinnacle Advert. & Mktg. Grp., Inc.*, 7 F.4th at 1010 (quoting *McCarthy on Trademarks and Unfair Competition* § 31:12 (5th ed. 2021)). "Courts have previously recognized two categories of prejudice caused by a delay in bringing a trademark infringement suit—evidentiary prejudice and

---

[9] GOAA never explains what its Palitos reports are, what data they collect, or the reliability of that data.

economic prejudice." *Id.* (collecting cases). SAA contends that it has spent "considerable time, money, and other resources developing its brand and as a result has gained substantial goodwill." (Doc. 35, p. 19; Doc. 36-27, ¶¶ 13–19). SAA also points to expenses incurred defending against the opposition proceedings and GOAA's counterclaim. (Doc. 35, p. 19). SAA further notes that witnesses, including GOAA's Board members who participated in discussions regarding SAA's mark in 1995–1996 have passed away. (*Id.* at p. 18).

As for SAA's assertion that GOAA's unexcused delay in protecting its mark has caused SAA undue prejudice via economic harm, GOAA contends SAA would have incurred the same advertising expenses with a non-infringing mark. (Doc. 43, p. 18). The Eleventh Circuit in *Pinnacle Advert. & Mktg. Grp., Inc.,* rejected GOAA's argument, finding:

> [i]f Pinnacle Florida had known of Pinnacle Illinois's infringement and unfair competition claims sooner, it could have redirected its resources into promoting its business and brand under a different name during the four years it continued to promote the Pinnacle mark after Pinnacle Illinois should have known of its infringement and unfair competition claims.

7 F.4th at 1011. Thus, undue prejudice was found to exist during the four years that the holder of the superior mark should have acted to bring a claim. *Id.* Additionally, GOAA's assertion that SAA decided to "select an infringing mark" is unsupported by the record. GOAA contends there was no provable claim for infringement until 2015, and, in the same breath, argues that SAA selected an infringing mark in the mid-1990s. It bears repeating that GOAA may have discussed its concern about

SAA's use of a similar mark on June 14, 1995, but it never commissioned the survey recommended by its counsel or filed a claim for infringement. If GOAA did not have a provable claim for infringement when SAA adopted the Orlando Sanford International Airport mark in 1996, how could SAA have selected a mark that it knew infringed GOAA's mark? Hence, GOAA's reliance on *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1547 (11th Cir. 1986) is misplaced.

The Court also rejects GOAA's argument that the passage of decades since SAA adopted its mark does not constitute evidentiary prejudice, because SAA could have deposed Mr. Hattaway while he was alive, and since other board members are still living. (Doc. 43, p. 18). Common sense dictates that memories can fade, and by delaying decades to enforce its mark, GOAA forces SAA to confront witnesses long after the events in question. Undue evidentiary prejudice is one reason that the law provides for statutes of limitations and why the doctrine of laches exists. For these reasons, the Court grants Plaintiff Sanford Airport Authority's Motion on the defense of laches.

### B.    Acquiescence

"The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent." *Coach House Res., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991). To prove acquiescence, three elements must be established: (1) the trademark owner actively represented that it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and

(3) the delay caused the alleged infringer undue prejudice. *Univ. of Ala. Bd. of Trs.
v. New Life Art, Inc.*, 683 F.3d 1266, 1282 (11th Cir. 2012). "Active consent does
not necessarily mean an explicit promise not to sue. It only requires conduct on
the [trademark owner's] part that amounted to an assurance to the [alleged
infringer], express or implied, that [trademark owner] would not assert his
trademark rights against the [alleged infringer]." *Id.* (quotations and citations
omitted).

The facts that support summary judgment on SAA's laches defense also
support summary judgment on acquiescence. On May 17, 1995, GOAA's Board
identified Sanford as an "airport [that] is using our name." (Doc. 36-1, ¶ 19 (citing
Doc. 36-8, at GOAA - 00360)). GOAA's Board voted to have its legal counsel
address this issue, and one month later, counsel advised the Board to discuss its
concerns with SAA and to conduct a survey if no resolution was reached. (*Id.* ¶ 20).
GOAA's executive director met with SAA's director of aviation and memorialized
their dinner-meeting in a letter dated June 30, 1995:

> Dear Steve:
>
> It was good to get together with you and Kay last evening. I
> certainly enjoyed dinner and the conversation following on
> the growth of our thriving community. I do want to take this
> opportunity to reflect on the areas which mutually affect us.
>
> Based on comments from our General Sales Agent in the UK
> as well as Board members and staff, we believe that there is a
> strong likelihood of confusion and, therefore, disservice to the
> visitor with two airports having a similar-type of name. I
> offered to participate in a survey which might take some of the
> subjectivity out of this issue but I understand you need some
> time to consider this idea.

As our marketplace grows with the recently announced
expansion plans by Walt Disney World and Universal, I
believe there are opportunities for both airports to grow.
Areas of potential, mutual interest could include the staffing
of Federal agencies to assure that the customer using either
airport receives a consistently high quality of service. I also
believe that there are potential joint operational
considerations that could be addressed ranging from safety
and security training to recommendations of the Sanford
airport as an alternate airport for Orlando International
Airport during irregular operations. I also believe that there
are some potential, joint airport marketing opportunities
which would allow the Central Florida area to optimize its
airport resources.

I do believe that the issue of the like names of the airports is
pivotal, and the current similarity in names unnecessarily
complicates our mutual efforts to capitalize on these
opportunities.

Thanks again, Steve, for the chance to meet. I would welcome
the opportunity to further discuss options which are in our
region's best interest.

Sincerely,

Robert B. Bullock

cc:    Chairman Bob Hattaway
       Chairman A. K. Shoemaker, Jr.

(Doc. 36-13).

While acknowledging the similarity between SAA's mark and GOAA's mark, Mr.

Bullock highlights the advantages of coexistence and cooperation. (Doc. 36-13).

The record shows no meetings or correspondence after that in which GOAA

challenges SAA's right to use the Orlando Sanford International Airport mark or

the Orlando Sanford Airport mark. Based on the record before the Court, the next

time SAA hears of GOAA's displeasure with their symbiotic relationship is when

GOAA files its opposition to SAA's marks. GOAA admits that it never conducted

the survey recommended by its counsel and did not consider investigating the

likelihood of confusion until 2015. Based on these undisputed facts, the Court finds

that GOAA's actions after June 30, 1995, implied an assurance to SAA that GOAA

would not assert its trademark rights against SAA. GOAA provides no valid reason

for the delay between its acquiescence and the assertion of its infringement claim,

for the reasons discussed *supra* in Section III subpart (A)(3), and the undue

prejudice to SAA is addressed in Section III subpart (A)(4).

Accordingly, Plaintiff Sanford Airport Authority's motion for summary

judgment on acquiescence is granted. The Court denies SAA's motion for summary

judgment on the issue of likelihood of confusion, recognizing that in certain

circumstances, laches and acquiescence do not preclude issuance of an injunction.

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir.

2008).

## IV.    CONCLUSION

For these reasons, Plaintiff Sanford Aviation Authority's Motion for

Summary Judgment (Doc. 35) is **GRANTED IN PART** and **DENIED IN PART**,

as follows:

1.    The Motion for Summary Judgment (Doc. 35) is **GRANTED** on

SAA's Laches Defense and on Acquiescence.

2.    The Motion for Summary Judgment (Doc. 35) is **DENIED** on the

issue of GOAA's Counterclaim for Likelihood of Confusion.

**DONE AND ORDERED** in Orlando, Florida on March 15, 2026.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties